**UNITED STATES of America**

v.

**VICTOR TEICHER & CO., L.P., Victor Teicher, and Ross S. Frankel, Defendants.**

No. 88 Cr. 796 (CSH).

United States District Court, S.D. New York.

Dec. 19, 1989.

Roger S. Hayes, Acting U.S. Atty., S.D. N.Y., New York City (Carl H. Loewenson, Jr., Martin Klotz, of counsel), for U.S.

Morvillo, Abramowitz & Grand, P.C., New York City (Paul R. Grand, J. Kelly Strader, of counsel), for defendant Ross S. Frankel (Robert G. Morvillo, Robert J. Anello, Catherine M. Foti, of counsel), for defendants Victor Teicher & Co., L.P. and Victor Teicher.

HAIGHT, District Judge:

Trial in this insider trading case is scheduled to begin on January 16, 1990. Defendants now move for various pre-trial relief.

### Background

Familiarity with the general background of the captioned action and this Court's prior opinions in the companion case of *United States v. Marcus Schloss & Co.* is assumed. However, a brief summary of the procedural history of the case is useful.

The original indictment in this action named D. Ronald Yagoda and Marcus Schloss & Co. Inc ("MS & Co.") as defendants along with Victor Teicher & Co., L.P. and Victor Teicher (collectively, the "Teicher defendants"), as well as Ross S. Frankel. Due to certain scheduling concerns of the government, it consented to a partial severance of the case. The trial of MS & Co. and Yagoda commenced on May 22, 1989 with the Teicher defendants and Frankel to be tried separately. After a five week jury trial, the jury acquitted Yagoda of all counts and convicted MS & Co. of two of the eight counts contained in the indictment.

In consequence of the rulings made by this Court in *United States v. Marcus Schloss*, 710 F.Supp. 944 (S.D.N.Y.1989), the government has redacted the indictment for use in this second trial, the Teicher and Frankel trial.[1] Defendants take issue with the sufficiency of the redactions and further contest the legal sufficiency of certain counts. The defendants also move for a severance of the trial between Frankel and the Teicher defendants, or, in the alternative, for a severance of certain counts. In addition, defendants move for a

---

1. All references to the indictment are to the redacted indictment unless otherwise noted.

bill of particulars and other pre-trial discovery. I deal with these issues in turn.

*Discussion*

I. Conspiracy Count

Count 1 of the redacted indictment charges the Teicher defendants,[2] Frankel,[3] Robert Salsbury,[4] and Michael David [5] with conspiracy to commit securities fraud.

A. *Duplicitousness*

Defendants argue that the conspiracy count is facially improper in that it charges multiple conspiracies. Defendants thus conclude that Count 1 must be dismissed as duplicitous. Specifically, defendants argue that Count 1 charges four separate conspiracies, three of which revolve around David and one of which, the so-called "Drexel phantom list" conspiracy, is wholly separate from those other three. The Frankel memorandum describes the so-called David-centered conspiracies as set forth below.

First, the government alleges a conspiracy pursuant to which Victor Teicher purportedly received material non-public information from David with respect to four securities. The Teicher defendants allegedly traded on the basis of that information on seven occasions (Counts 5–9, 12–13).

Second, the indictment alleges a conspiracy pursuant to which Michael David purportedly provided material, non-public information directly to co-conspirator Robert Salsbury with respect to some five securities. The indictment then alleges that Mr. Salsbury passed this information to Mr. Frankel with respect to three of these securities (¶¶ 13(13), (14),

(17)), but that Mr. Frankel only traded on that information in one security, American Brands, Inc. This is the trading with which Mr. Frankel is charged in Count 9.

Third, the indictment alleges a conspiracy pursuant to which material non-public information concerning Revco D. S., Inc., purportedly flowed from Marcus Schloss & Co., Inc., to Mr. David, to Mr. Teicher (¶ 12(e)).... The indictment further alleges that Mr. Teicher traded the securities of Revco while knowingly in the possession of material non-public information.

Memorandum of Law in Support of Frankel's Motion to Sever at 8–9 (footnotes omitted).

The memorandum of the Teicher defendants describes the so-called fourth conspiracy, the Drexel phantom list conspiracy as below.

Allegedly, Salsbury, at times on his own initiative and at times at the purported initiative of Frankel, revealed directly to Mr. Teicher and "other co-conspirators" the identities of companies on Drexel's so-called "phantom" list. *See* [Redacted indictment] at ¶ 12(d). According to the indictment, this phantom list contains the names of companies "involved in corporate takeovers that Drexel ... might finance." *See* [*id.*] at ¶ 12(c).

Teicher Supplemental Memorandum at 9. The indictment further alleges that "Drexel Burnham employees were prohibited from disclosing the contents of the 'phantom' list to anyone outside of Drexel Burnham." Indictment at ¶ 12(c).

---

**2.** Victor Teicher & Co., L.P. ("Teicher & Co.") was, at all times relevant to the indictment, a Delaware limited partnership with its principal place of business in New York City. Teicher & Co. was, at all relevant times, "engaged principally in the business of risk arbitrage, that is, trading in the securities of companies that were the subject of proposed or anticipated corporate takeovers." Indictment at ¶ 2.

Victor Teicher was, at all relevant times, the sole general partner of Teicher & Co. *Id.* at ¶ 3.

**3.** Frankel was, at all times relevant to the indictment, employed by Drexel Burnham Lambert ("Drexel") in its domestic arbitrage department

in New York City. During the relevant time period, the Drexel domestic arbitrage department "engaged principally in the business of risk arbitrage." Indictment at ¶ 5.

**4.** During the relevant time period, Salsbury was employed as an arbitrage research analyst in Drexel's domestic arbitrage department. Indictment at ¶ 5.

**5.** David was, at all relevant times, employed by the law firm of Paul, Weiss, Rifkind, Wharton, and Garrison ("Paul Weiss") in New York City. Indictment at ¶ 6.

Not surprisingly, the government characterizes the conspiracy charged in the indictment very differently. It describes the conspiracy as a "web of inter-connected, mutually dependent relationships with a common goal: to exchange material non-public information stolen from the co-conspirators' employers and clients of their employers and to buy and sell securities while in possession of that material non-public information." Government's Memorandum of Law at 4. The government further describes the conspiracy as one where its "members ... operated with awareness of the identities and roles of other members of the conspiracy." *Id.*

Defendants rely heavily on *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) for the proposition that Count 1 charges not one, but multiple conspiracies. In that case, one Brown placed false loan applications for other persons under the National Housing Act. Brown exacted a fee for filing the applications, which he knew to be fraudulent at the time they were filed. The government indicted thirty-two persons in all, including Brown and various of the persons who used his services in placing loan applications. The Supreme Court addressed the question of whether the defendants were properly charged with and convicted of a single conspiracy. The Court answered that question in the negative.

The government in *Kotteakos* argued that there was a pattern of conspiracy in that case: the "pattern was 'that of separate spokes meeting in a common center.'" *Id.* at 755, 66 S.Ct. at 1243. However, the Court reversed the judgments of conviction, noting that the lack of a "rim of the wheel to enclose the spokes" was fatal to the government's case. *Id.* Where there are "numerous participants in ... different schemes ... who did not know or have anything to do with one another", a single conspiracy cannot be properly charged. *Id.* at 758, 66 S.Ct. at 1244.

In *Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), the Court again had occasion to examine the question of single versus multiple conspiracies. In that case, five individuals were "convicted of conspiring to sell whiskey at prices above the ceiling set by regulations of the Office of Price Administration, in violation of the Emergency Price Control Act." *Id.* at 541, 68 S.Ct. at 249. The five sellers argued that a single conspiracy did not exist and had not been proven. That argument stemmed from the fact that the individual sellers did not know the identity of the individual who owned the whiskey. The Court affirmed the convictions stating that "it would be a perversion of justice to regard the salesmen's ignorance of the unknown owner's participation as furnishing adequate ground for reversal of their convictions." *Id.* at 558, 68 S.Ct. at 257.

[C]onspiracies involving ... elaborate arrangements generally are not born full-grown. Rather they mature by successive stages which are necessary to bring in the essential parties. And not all of those joining in the earlier ones make known their participation to others later coming in.

The law does not demand proof of so much. For it is most often true, especially in broad schemes calling for the aid of many persons, that after discovery of enough to show clearly the essence of the scheme and the identity of a number participating, the identity and the fact of participation of others remain undiscovered and undiscoverable. Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of participation of others. Otherwise the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity.

*Id.* at 556–57, 68 S.Ct. at 256 (footnote omitted). Therefore, it is sufficient that the conspirators "knew or must have

known" of the existence of other conspirators and their participation in a larger project. *Id.* at 558, 68 S.Ct. at 257. *See also United States v. Nerlinger*, 862 F.2d 967 (2d Cir.1988).

The Second Circuit recently addressed this question in *United States v. Vanwort*, 887 F.2d 375 (2d Cir.1989).

A single conspiracy may be found where there is " 'mutual dependence and assistance' among the [participants], a common aim or purpose .. or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture.' " *United States v. Bertolotti*, 529 F.2d 149, 154 (2d Cir.1975) (citation omitted) (quoting *United States v. Tramunti*, 513 F.2d 1087, 1106 (2d Cir.), *cert. denied*, 423 U.S. 832 [96 S.Ct. 54, 46 L.Ed.2d 50] (1975)). All that needs to be proved is that " 'it reasonably could be inferred that [the appellants] participated in the alleged enterprise with a consciousness of its general nature and extent.' " *United States v. Rooney*, 866 F.2d 28, 32 (2d Cir.1989) (quoting *United States v. Alessi*, 638 F.2d 466, 473 (2d Cir.1980)). The members of the conspiracy do not have to "conspire directly with every other member of it, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member." *Id.* (citations omitted). There is no requirement that the same people be involved throughout the duration of the conspiracy. *See id.* Furthermore, "a single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations." *United States v. Cambindo Valencia*, 609 F.2d 603, 625 (2d Cir.1979), *modified on rehearing*, 609 F.2d 603, 641 (2d Cir.), *cert. denied*, 446 U.S. 940 [100 S.Ct. 2163, 64 L.Ed.2d 795] (1980).

at 383.

■ In the Marcus Schloss trial, motions to dismiss the conspiracy count as duplic-

itous were also made, but the severance agreed to by the government rendered the issue moot. However, in that context I said the following:

If the case were before me on the original motions of all defendants to dismiss the conspiracy count as duplicitous, I would have three options: to conclude that the conspiracy count was facially duplicitous and require repleading or separate trials; to accept the government's conclusory allegation of a single conspiracy and deny any pre-trial relief; or to regard the single conspiracy allegation as problematical at best, and require the government to make an *in camera, ex parte* offer of proof prior to trial. I believe, had the original motions come to fruition, that I would have inclined towards that middle course.

710 F.Supp. at 954 (footnote omitted). I now choose that middle course.[6]

The government's offer of proof suggests that there may be evidence from which a properly charged jury could find that there existed a single conspiracy whose members were Teicher, Teicher & Co., Frankel, Salsbury and David. Rather than there being three David-centered conspiracies, there is evidence that David's tippees knew of one another's existence and were mutually dependent on David, and one another, as sources of inside information. The fact that the origin of the inside information provided by David varied between Paul Weiss and MS & Co. does not in itself turn the single conspiracy alleged in the indictment into multiple conspiracies. *United States v. Heinemann*, 801 F.2d 86, 92 (2d Cir.1986), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987). Of course, the fact that David tipped Teicher as well as Salsbury (who then tipped Frankel) does not alone give rise to a conspiracy unless the tippees knew or had reason to know that their activities were part of a larger insider trading enterprise.

---

**6.** In response to my preliminary observations in *Marcus Schloss*, the government filed an *ex parte* offer of proof in this case. That offer of proof takes the form of an affidavit from Carl H. Loewenson, Jr., one of the Assistant United States Attorneys in charge of the case.

It appears that the government could, at a minimum, establish that sort of conspiracy present in *Nerlinger*, a conspiracy where the conspirators knew of their participation in a larger enterprise without knowing the identity or function of the other participants. That sort of proof is itself sufficient to establish a single conspiracy. However, the government appears to have proof of a much more direct relationship between the various conspirators, where each knew not only of the existence of others, but the identity of those others and their role in the conspiracy. Indeed, it seems that the government may be able to show that the so-called fourth conspiracy, or Drexel phantom list conspiracy, was not a separate agreement, but rather served as part of the overall insider trading scheme in which Frankel and the Teicher defendants participated, and from which they all benefitted. In other words, on the basis of its offer the government could establish that the defendants "had specific knowledge of each other's existence and acts, and worked together to make the conspiracy succeed", in which case "there was single conspiracy *a fortiori.*" *Marcus Schloss, supra* at 955.

At present, I say only that the indictment properly alleges a single conspiracy as further demonstrated by the government's offer of proof; but the ultimate question of " '[w]hether the evidence ... establishes single or multiple conspiracies is a question of fact to be resolved by a properly instructed jury.' " *Nerlinger, supra* at 972. *See also United States v. Neresian,* 824 F.2d 1294, 1302 (2d Cir.1987) (" 'the issue of single versus multiple conspiracies is one which is committed to the province of a properly instructed jury' ") (citations omitted), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987).

Defendants' motion to dismiss the conspiracy count as duplicitous is denied.

### B. *Improper Joinder, Fed.R.Crim.P. 8(b)*

Frankel and the Teicher defendants argue that because the conspiracy charged in the indictment is duplicitous and must be dismissed, there remains no reason to join them for trial under Rule 8(b). That rule states as follows:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

■ It is well established that "a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed.R. Crim.P. 8(b)." *Nerlinger, supra* at 973 (citations omitted). As discussed above, the indictment properly charges a single conspiracy in which all of the defendants participated. It is therefore plain that joinder is proper under Rule 8(b).

### II. Legal Sufficiency of Fraud Counts

#### A. *Allegations of Scienter*

The indictment charges the Teicher defendants with violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5 ("10b–5"). Frankel is also charged with a 10b–5 violation in respect of his trading in American Brands. These alleged violations spring from the misappropriation of inside information by a third party.

Specifically, Counts 2, 3, 4 and 11 allege violations by the Teicher defendants arising out of the misappropriation of information from the Drexel phantom list in respect of the following securities: Republic Airlines, Inc.; Westchester Financial Services Corp.; Western Union; and Warnaco, Inc. Counts 5, 6, 7, and 8 allege 10b–5 violations as to the Teicher defendants arising out of the misappropriation of information from the Paul Weiss firm in respect of the following securities: American Can Corp.; Allegheny International, Inc.; and Avondale Mills (Counts 7 and 8). Count 9 charges both the Teicher defendants and Frankel with a 10b–5 violation arising out of the misappropriation of information

from the Paul Weiss firm in respect of American Brands, Inc. Finally, Count 10 charges the Teicher defendants with a violation arising out of the misappropriation of information from MS & Co. in respect of Revco D.S., Inc.

Counts 14 through 22 of the indictment charge Teicher individually with mail fraud in violation of 18 U.S.C. §§ 1341 and 1342. Counts 14 through 17 allege violations of the mail fraud statute arising out of the misappropriation of information from the Drexel phantom list. Counts 18 through 22 allege mail fraud violations arising out of the misappropriation of information from the Paul Weiss firm. Again the alleged misappropriations are those of a third party.

The Teicher defendants and Frankel argue that the indictment fails to allege the requisite scienter, or more specifically that the "indictment fails to allege that Teicher or the Company had any knowledge with respect to any of these misappropriations." Supplemental Teicher Memorandum at 37. The Teicher defendants thus argue that Counts 2 through 11 and 14 through 22 should be dismissed. Frankel similarly argues that Count 9 should be dismissed as to him.

The elements of a 10b–5 violation are well defined. The government must establish that the defendant knowingly and wilfully, (1) employed any device, scheme or artifice to defraud or (2) engaged in any act, practice or course of business which operated or would operate as a fraud or deceit upon any person, in connection with the sale or purchase of securities. Additionally, the government must establish the jurisdictional element of the offense, namely use of the mails, means or instrumentality of interstate commerce, or a facility of a national securities exchange in furtherance of the fraudulent scheme. Scienter is thus clearly an element of the offense. It is the contention of the defendants that the indictment fails to allege scienter as an element of the 10b–5 violation.

It is well settled that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974) (citations omitted).

> It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as "those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished."

*Id.* (*quoting United States v. Carll*, 105 U.S. 611, 612, 26 L.Ed. 1135 (1882)). The Second Circuit has said that "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir.1975), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 55, 46 L.Ed.2d 50 (1975) (citations omitted). In the 10b–5 context it is sufficient if the indictment follows the language of the statute, thus "alleging all of the essential elements of the crime charged." *United States v. Gleason*, 616 F.2d 2, 28 (2d Cir. 1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980).

■ The instant indictment clearly passes muster. Paragraph 15 of the indictment clearly alleges the requisite intent. It charges the defendants with "unlawfully, knowingly, and wilfully" violating Section 10(b) and Rule 10b–5 by trading in the enumerated securities. The same holds true for the charges against Teicher under the mail fraud statute. Paragraph 20 clearly alleges a "knowing[ ] and wilfull[ ]" violation of the statute. This is all that is required. Accordingly, defendants' motion to dismiss the enumerated counts for failure to allege scienter is denied.

### B. *Materiality*

The Teicher defendants move for dismissal of various of the securities fraud counts on the grounds that the misappropriated information was not material.

The standard of materiality in securities fraud cases was set forth by the Supreme Court in *T.S.C. Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).[7] In that case the Court said the following:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> What the standard ... contemplate[s] is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

(footnote omitted).

### 1. Drexel Phantom List

The Teicher defendants move for dismissal of Counts 2, 3, 4 and 11 on the grounds that the information allegedly misappropriated from the Drexel phantom list is not material as a matter of law. The Teicher defendants ask this Court to dismiss those Counts in advance of trial.

In *Northway*, the Court reversed the grant of summary judgment on the 14a–9 issue, holding that "[o]nly if the established omissions are 'so obviously important to an investor, that reasonable minds cannot dif-

fer on the question of materiality' is the ultimate issue of materiality appropriately resolved 'as a matter of law' by summary judgment." *Id.* at 450, 96 S.Ct. at 2132 (citations omitted). Presumably the circuit court of appeals, that court which directed the entry of judgment on the claim, had before it the relevant affidavits and other documentary evidence on the point, yet the Supreme Court said "[t]he determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Id.* (footnote omitted). In other words, where there is doubt about materiality, leave it for the jury. The fact that the Court's ruling arose in the civil context does not change that basic framework.

 The indictment describes the phantom list as one "which identified companies involved in corporate takeovers or possible corporate takeovers that Drexel Burnham might finance." Indictment at ¶ 12(c). It is precisely this type of information, news of possible corporate takeovers or restructuring, that investors use in deciding whether to buy or sell securities. To obtain dismissal of these counts, defendants must show that reasonable minds could only conclude the information was not material under *Northway*. They have not done so. Accordingly, I deny defendants' motion to dismiss those counts arising out of the alleged misappropriation of information from the Drexel phantom list.[8]

7. *Northway* was a case involving violations of Rule 14a–9, which governs proxy solicitations. However, in *Basic Inc. v. Levinson*, 485 U.S. 224, 232, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988), the Court expressly adopted the *Northway* standard of materiality in the § 10(b) and Rule 10b–5 contexts.

8. The Teicher defendants further argue that the information on the Drexel phantom list is not proprietary as a matter of law, and therefore cannot form the basis for a misappropriation. The government contends that its proof will establish the proprietary nature of the list. The government states that Drexel policy was clear insofar as the information on the list was to be given only to certain employees of the organiza-

tion and that the information was under no circumstances to be disseminated to outsiders. Cases such as *United States v. Carpenter*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *United States v. Grossman*, 843 F.2d 78 (2d Cir. 1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989); and *United States v. Newman*, 664 F.2d 12 (2d Cir.1981), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983) stand for the proposition that under circumstances such as the government states it will prove, this information may indeed be the basis for a misappropriation charge.

Of course, if at the close of the government's case, defendants are of the view that the government has failed to establish the proprietary na-

## 2. American Brands

■ The Teicher defendants further argue that the information concerning American Brands allegedly passed on by David fails the test of materiality. I rejected this argument in the context of the post-trial motions made on behalf of MS & Co. *United States v. Marcus Schloss*, slip op., 1989 WL 153353 (December 6, 1989) at 14–17. The instant motion fails for the same reasons.

## 3. Revco

The Teicher defendants further argue that "much like the information concerning American Brands, passed by David, the information on Revco that Solomon passed to David was pure conjecture and not material nonpublic information." Supplemental Teicher Memorandum at 55–56 (footnote omitted). Again, I reject the argument without prejudice to its renewal at the close of the government's case. At the present time, however, I have no difficulty in concluding that Solomon's tip to David concerning a possible leveraged buyout of Revco would be material in the mind of the average investor in his determination of whether to buy, sell, or sell short Revco shares.

## C. *Mail and Wire Fraud Counts (Frankel)*

Defendant Frankel moves to dismiss the mail and wire fraud counts, Counts 23 and 24, against him on the grounds that "they fail to allege that Mr. Frankel engaged in a scheme to deprive a deceived party of money or property." Frankel Memorandum in Support of Motion to Dismiss at 16.

## 1. Mail Fraud

Count 23 alleges a violation by Frankel of the mail fraud statute, 18 U.S.C. § 1341.[9] The indictment charges as follows:

On or about March 11, 1986, in the Southern District of New York, the defendant ROSS S. FRANKEL unlawfully, knowingly and wilfully, and for the purpose of executing and attempting to execute the foregoing scheme and artifice, did cause to be placed in post offices and authorized depositories for mail matter, and did cause to be delivered by mail according to the direction thereon mail matter and things, to wit, a confirmation of purchase of 12 June 75 American Brands call options in the account of the defendant ROSS S. FRANKEL at Drexel Burnham, in New York, New York.

Indictment at ¶ 22. Despite Frankel's protestations to the contrary, the scheme referred to in the mail fraud count is clearly that involving David's misappropriation of material, non-public information concerning American Brands from Paul Weiss, and the subsequent use of that information by Frankel. Indeed, for purposes of his motion to dismiss, Frankel "assumes" that the alleged scheme is that concerning American Brands.

■ It is well settled that the mail fraud statute protects property rights, *McNally v. United States*, 483 U.S. 350, 360, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987), and it is common ground that confidential, exclusive proprietary business information comes within that class of property protected by the statute. *Carpenter v. United*

---

ture of the information on the phantom list, they may renew the argument.

**9.** The statute provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341.

*States,* 484 U.S. 19, 25–26, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987). *See also Newman,* 664 F.2d at 19 ("[i]ntangibles such as 'confidential and nonpublic commercial information' fall within the definition of 'property' under the mail fraud statute") (citations omitted). Clearly, the information stolen by David is encompassed by this definition of property.

> [T]he fact that [law firm] could not commercially exploit the information by trading on it does not mean the confidentiality of the information had no commercial value to the firm. As several partners of the firm testified, maintaining the confidentiality of the information was of commercial value because, by maintaining confidentiality, the firm would protect or enhance the firm's reputation, with the result that it would not lose its clients and perhaps would gain more clients.

*Grossman, supra* at 86.

■ Frankel's argument as to the mail fraud count is twofold. First, he argues that the indictment fails because it is nowhere alleged that Frankel himself stole any confidential, proprietary information. Second, Frankel argues that the indictment does not allege that he traded on the American Brands "tip" with knowledge that it was inside information. I address these arguments in turn.

As to the first prong of the argument, it is irrelevant that David, not Frankel, allegedly stole the information concerning American Brands. *See Newman, supra* at 19–20 (mail fraud charge against securities trader proper where he traded on confidential information allegedly misappropriated by others from their investment banking employers); *Carpenter, supra* 484 U.S. at 25–28, 108 S.Ct. at 320–321 (mail fraud conviction of trader upheld where he traded on confidential information misappropriated from the *Wall Street Journal* by one of its reporters).

The second portion of Frankel's argument, namely that the indictment fails to allege that he traded on the American Brands tip with the knowledge that it was inside information, is equally unavailing. As discussed in text *supra,* in connection with the substantive securities fraud counts, tracking the language of the statute is sufficient in respect of alleging the requisite scienter. The mail fraud count clearly meats that standard in its use of the "unlawfully, knowingly and wilfully" language. As a result, Frankel's motion to dismiss Count 23 of the indictment fails.

### 2. Wire Fraud

Frankel also challenges the wire fraud charge contained in Count 24 of the indictment, which alleges as follows:

> On or about March 28, 1986, in the Southern District of New York and elsewhere, the defendant ROSS S. FRANKEL unlawfully, knowingly, and wilfully, and for the purpose of executing and attempting to execute the foregoing scheme and artifice, did transmit and cause to be transmitted communications in interstate commerce, to wit, a telephone call between the defendant FRANKEL in Florida and a co-conspirator on Long Island, New York.

Indictment at ¶ 24.[10]

Like the mail fraud statute, the wire fraud statute "prohibit[s] devising a 'scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *United States v. Evans,* 844 F.2d 36, 38 (2d Cir.1988) (citation omitted). Again, like the mail fraud count, the alleged scheme is that surrounding the misappropriation of information concerning American Brands. The party alleged to have been defrauded is thus the Paul Weiss firm. In order to support a charge of wire fraud the wire must have been made " 'for

---

**10.** Frankel is charged with having violated 18 U.S.C. § 1343, which provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be trans-

mitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

the purpose of executing' the fraudulent scheme charged in the indictment." *United States v. Iorizzo*, 786 F.2d 52, 60 (2d Cir.1986) (citations omitted).

The telephone communication alleged to have been in furtherance of the scheme is one by Frankel to a Drexel employee in which Frankel asked that employee to destroy a page from Frankel's desk calendar. That phone call was allegedly placed "on or about" March 28, 1986, at which time Frankel knew of the SEC investigation. Original indictment at ¶ 17(54).[11] Thus, the phone call was not for the purpose of executing the scheme to defraud Paul Weiss, but rather was an effort to cover up Frankel's participation in that very scheme, a scheme which had already ended and been discovered by the SEC. That is the government's specific charge in Count 26: that between March 27 and March 31, 1986, Frankel caused the "destruction of documents relevant to SEC investigations."

█ It is true that communications subsequent to the end of a scheme to defraud can support a wire fraud charge where they "were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *United States v. Maze*, 414 U.S. 395, 403, 94 S.Ct. 645, 650, 38 L.Ed.2d 603 (1974). That is not the situation at bar. The relevant inquiry "is whether the [communication] is part of the execution of the scheme as conceived by the perpetrator at the time" of the communication. *Schmuck v. United States*, —— U.S. ——, 109 S.Ct. 1443, 1449, 103 L.Ed.2d 734 (1989). Frankel made the phone call not to lull Paul Weiss into a false sense of

security or to postpone Paul Weiss's complaint to the authorities. The authorities, the SEC, were already well aware of the scheme and indeed were investigating it at the time of the telephone call. Although the telephone call was, at the time it was made, intended to defraud the SEC and obstruct its investigation, that scheme cannot be reached by the wire fraud statute. *Cf. McNally v. United States*, 483 U.S. 350, 356, 107 S.Ct. 2875, 2879, 97 L.Ed.2d 292 (1987) (the "fraud statute[s] clearly protect[ ] property rights, but do[ ] not refer to the intangible right of the citizenry to good government") (dishonesty in conduct of public affairs not within reach of mail fraud statute).

The government argues (Memorandum of Law at 39) that the "primary difference" between Counts 23 and 24 is that the former involved the mails and the latter a telephone. To the contrary, the primary difference lies between the earlier mailing of the American Brands confirmation, in clear execution of the alleged insider trading scheme, and Frankel's telephone effort to obstruct the SEC investigation once the scheme had come to light. The government may prove the telephone call as an act of obstruction in violation of 18 U.S.C. § 1505; *see* Count 26. Arguably the telephone call is probative on the conspiracy; that may be considered later. But the call does not support a substantive wire fraud count.

Accordingly, Count 24 will be dismissed.

### III. Prosecution of Teicher and Teicher & Co.

█ Counts 1 through 13 of the indictment charge both Teicher and Teicher &

---

11. Although the redacted indictment is the operative document in respect of this trial, the government cannot now retreat from the allegations contained in the original indictment, the official court document in the action. Paragraph 17(54) lists the following as one of the overt acts in furtherance of the insider trading conspiracy.

> On or about March 27, 1986, in New York, New York, *upon being informed of the initiation of the SEC's investigation of co-conspirators David and Salsbury,* the defendant ROSS S. FRANKEL directed a Drexel Burnham domestic arbitrage department employee to re-

trieve Salsbury's check from the Drexel Burnham cashier.

(emphasis added).

Yet the phone call, the basis for the wire fraud charge, is not alleged to have been made until the day after Frankel was informed of the SEC investigation.

> On or about March 28, 1986, the defendant ROSS S. FRANKEL in Florida by telephone asked a co-conspirator employed in the Drexel Burnham domestic arbitrage department to destroy a page from FRANKEL's desk calendar.

Original indictment ¶ 17(56).

Co., a partnership said to be comprised only of Teicher and one limited partner. Proceeding from the premise that "it is but a legal fiction that the partnership committed a crime on its own," Supplemental Teicher Memorandum at 68, the Teicher defendants contend that prosecuting both Teicher and the partnership "is fundamentally unfair." *Id.* at 69. I am asked to require the government to elect to proceed as to Counts 1 through 13 against either Teicher or the partnership.

Neither the defendants nor the government cites any authority squarely on point. It is apparent, however, that defendants' basic premise is flawed. A partnership can indeed commit "a crime on its own." The Supreme Court reached that conclusion in *United States v. A. & P. Trucking Co.*, 358 U.S. 121, 79 S.Ct. 203, 3 L.Ed.2d 165 (1958). A partnership owning trucks engaged in interstate transportation was prosecuted for "knowingly and willfully" violating federal certification requirements and motor carrier regulations. The district court dismissed, on motion, the informations "on the grounds that a partnership entity cannot be guilty of violating the statutes involved." 358 U.S. at 122, 79 S.Ct. at 205. The Court reversed and reinstated the informations:

> We hold, therefore, that a partnership can violate each of the statutes here in question quite apart from the participation and knowledge of the partners as individuals. The corollary is, of course, that the conviction of a partnership cannot be used to punish the individual partners, who might be completely free of personal guilt. As in the case of corporations, the conviction of the entity can lead only to a fine levied on the firm's assets.

*Id.* at 126–27, 79 S.Ct. at 207.

There is therefore no basis in law for requiring the government to make a pre-trial election between Teicher and the partnership. The principle of fairness upon which defendants rely may arise at sentencing, depending upon the jury's verdict. The proper analysis is one of double jeopardy, although defendants do not make that claim explicitly in their brief. I need not reach the question now. If the jury acquits one or both of the Teicher defendants I will never reach it.

The double jeopardy issues involved are illustrated by *Western Laundry and Linen Rental Co. v. United States*, 424 F.2d 441 (9th Cir.), *cert. denied*, 400 U.S. 849, 91 S.Ct. 41, 27 L.Ed.2d 87 (1970). The indictment charged violations of the Sherman Act. Defendants included five corporations, one partnership, and five individuals. One individual defendant, Hazan, was a partner of the defendant partnership, Western. All defendants were convicted upon pleas of *nolo contendere.* Each defendant was sentenced to pay a fine. Hazan was fined $1,000. On appeal Hazan argued "that double jeopardy results from simultaneously levying upon (a) his personal assets for the personal fine and (b) those assets in the partnership that are legally his property for the partnership fine." 424 F.2d at 445 (Hufstedler, Ct. J., concurring specially). A panel of the Ninth Circuit rejected Hazan's argument, all three judges writing separately.

In the case at bar, these issues may or may not arise at a later day. It is sufficient for present purposes to deny the Teicher defendants' motion to require an election between them for prosecution.

## IV. Severance of Perjury and Obstruction Charges

▮ Defendants all move for severance of the perjury charge contained in count 25, which charges Frankel with violating 18 U.S.C. § 1621, as well as for severance of the obstruction charges contained in Counts 26 and 27, which allege violations of 18 U.S.C. § 1505. I deny the motion for the reasons that I denied Yagoda's motion, made prior to the earlier trial, to sever the perjury and obstruction charges against him from trial of the conspiracy and securities fraud counts. *Marcus Schloss, supra* at 958.

## V. Multiplicity of Counts

Frankel argues that the indictment twice charges the same offense in two separate

counts.[12] Specifically, he argues that Count 9 (securities fraud) charges the same offense as Count 23 (mail fraud), and that Count 25 (perjury) charges the same offense as Count 27 (obstruction of justice).

▇▇▇ The same offense cannot be charged in two counts of an indictment; to do so is violative of the double jeopardy clause. *Whalen v. United States,* 445 U.S. 684, 688, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980). The test for establishing whether two counts are multiplicitous was set forth by the Court in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

(citation omitted). "[W]hen the *Blockburger* test for multiplicity has been satisfied, and there is no evidence of congressional intent to the contrary, authority to impose cumulative penalties is presumed to be intended." *United States v. Reed,* 639 F.2d 896, 906 (2d Cir.1981) (citation omitted).

▇▇▇ The 10b–5 charge contained in Count 9 requires a showing of fraud in connection with the purchase or sale of any security, whereas securities need not be involved in order to prove mail fraud. In order to prove the mail fraud violation charged in Count 23, the government must establish use of the mails in furtherance of the alleged scheme, 18 U.S.C. § 1341, a fact not required to prove a 10b–5 violation. The jurisdictional element of the 10b–5 charge can be established by demonstrating use of the mails, any means or instrumentality of interstate commerce, or a facility of a national securities exchange.

The indictment thus is not multiplicitous on its face.[13] For instance, a defendant can be convicted of both mail and securities fraud where the government relies on mail as the jurisdictional element for the former, and telephone calls for the latter. *Reed, supra* at 905.

I turn now to Counts 25 and 27. Count 25 charges a violation of 18 U.S.C. § 1621, which provides:

> [w]hoever having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true [is guilty of a crime].

Counts 26 and 27 charge Frankel with obstruction of justice pursuant to 18 U.S.C. § 1505, which provides:

> [w]hoever corruptly ... influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States [is guilty of a crime].

Count 27, one of the two charging obstruction of justice, arises out of the same alleged perjured testimony given under oath to the SEC.[14] It is this identity of testimony that gives rise to Frankel's multiplicity argument.

Defendants place great weight on *United States v. Gregory,* 611 F.Supp. 1033 (S.D.N.Y.1985). In that case, Judge Weinfeld required the government to elect either the perjury or the obstruction charge

---

**12.** Frankel makes the same argument as to a third pair of counts, Count 24 (wire fraud) and Count 26 (obstruction of justice). That motion is rendered moot by the dismissal of the wire fraud count.

**13.** If after trial it appears that the counts were indeed multiplicious, the problem can be remedied at that time.

> The principal danger in multiplicity—that the defendant will be given multiple sentences for the same offense—can be remedied at any time by merging the convictions and permitting only a single sentence.
> *Reed, supra* at 904 n. 6.

**14.** Count 26 charges obstruction of justice in respect of destruction of documents at Frankel's direction, and is not implicated in this analysis.

where both arose out of the giving of false testimony before the Grand Jury. Judge Weinfeld wrote:

> During argument, this Court observed that under appropriate factual circumstances false swearing and obstruction of justice charges are not necessarily multiplicitous, but the Court raised the question whether in this instance, where the very same alleged false testimony is relied upon to sustain the Government's proof of the separate charges of false swearing and obstruction of justice, they are multiplicitous, particularly since intent is an essential element of each offense. Perjured testimony, no less than conduct directed against a grand or petit juror or other officer such as tampering by corruption, threats of harm, or injury or attempts otherwise to influence his action, "is an obvious and flagrant affront to the basic concepts of judicial proceedings." In this sense, perjured testimony *is* an obstruction of justice; to charge it here is to charge obstruction of justice. Additionally, in light of the various other charges against this and the other defendants, totalling twelve counts, to try [the defendant] for false swearing as well as obstruction of justice would complicate and add to matters to be considered under the various counts. The prosecution presses that it is entitled to have both types of the alleged crimes passed upon by the jury. The Court is not persuaded since here the Government relies upon the identical alleged false testimony to sustain the false swearing and obstruction of justice charges. It would be a different matter if the obstruction charges had as their factual basis some conduct such as an attempt to influence a juror outside the courtroom or to threaten him with injury or otherwise by direct action or conduct to divert him from his duty as a juror. No public purpose would be served by unduly burdening the jury with unnecessary issues. It is be-

yond challenge that as to each instance of allegedly false testimony the Government either succeeds or fails with respect to both charges upon the same evidence. If its proof sustains one charge, the public interest is vindicated. *Id.* at 1039 (emphasis in original). Judge Weinfeld did not undertake an analysis under *Blockburger.* Rather, his ruling proceeded from his concern for "unduly burdening the jury" by asking them to consider both counts. I do not feel that concern in the case at bar. Proper instructions on the law of both counts would dispense with any potential confusion.[15] I therefore turn to an analysis of multiplicity under *Blockburger.*

■ In order for the government to prove perjury it must establish that the defendant was under oath, a fact not necessarily required by the obstruction charge. The obstruction charge requires that the government prove that the defendant influenced, obstructed or impeded, or endeavored to influence, obstruct or impede due administration of justice, a fact not required by the perjury charge. Therefore, counts 25 and 27 are not multiplicitous and the motion to dismiss is denied.

## VI. Severance

### A. *Fed.R.Crim.P. 14*

Defendants move for severance pursuant to Rule 14, which provides:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

"Motions to sever under Rule 14 are committed to the sound discretion of the trial judge." *United States v. Chang An–Lo,* 851 F.2d 547, 556 (2d Cir.), *cert. denied,* ——

---

**15.** Yagoda was charged with perjury and obstruction of justice, both charges arising out of the giving of false testimony to the SEC. Counsel for Yagoda did not raise the issue of multiplicity and the jury was charged on both counts.

That charge, which I view as sufficiently ameliorating that sort of confusion with which Judge Weinfeld may have been concerned in *Gregory, supra,* is found in the transcript of the MS & Co. and Yagoda trial at pages 3166–85.

U.S. ——, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). In order to succeed on a Rule 14 motion, defendants must establish more than that they "would have ... a better chance of obtaining an acquittal at a separate trial." *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir.1988) (citation omitted), *cert. denied*, —— U.S. ——, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). The prejudice resulting from a single trial must be "so substantial as to amount to a 'miscarriage of justice.'" *Id.* (citation omitted).

Defendants cite *United States v. Gallo*, 668 F.Supp. 736, 750 (E.D.N.Y.1987), *aff'd*, 863 F.2d 185 (2d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989) and *United States v. Gilbert*, 504 F.Supp. 565 (S.D.N.Y.1980) in support of their motions for severance. Neither case carries the day for the defendants.

*Gallo* involved a lengthy RICO prosecution where the Court was faced with fourteen defendants some of whom were charged in many of the indictment's twenty-two counts and others only in a small number of those counts. In that case, the disparity between the evidence to be offered against the most central of the defendants and the more peripheral wrongdoers was enormous, and some defendants were charged only with discrete, non-violent crimes. Moreover, the government's case in *Gallo* was readily severed into its component parts. Although there was clearly a risk of real prejudice to the more minor defendants, Judge Weinstein did not view that as dispositive. Rather, he took into account the disadvantages to what he termed "monster" trials. In cases where trials will continue for many months, it does indeed become difficult to coordinate the schedules of witnesses, jurors, and lawyers alike. *Gallo, supra* at 754. In addition, the monster trial presents a very real problem for the trial judge in respect of trial management. *Id.* at 755. All these factors combined led Judge Weinstein to conclude that a severance was proper.

In *Gilbert, supra,* this Court was faced with the question of whether defendants peripheral to the alleged conspiracy and lately come to the illegal venture should be severed from the trial of the central figure. I concluded that such defendants should be severed from the trial of that central figure. 504 F.Supp. at 566.

▮ The situation at bar is manifestly different from that presented by the facts of *Gallo* and *Gilbert.* It is true that Frankel is charged in fewer substantive counts than the Teicher defendants, but this is not a "monster" case like *Gallo* where huge quantities of evidence relevant only to certain defendants would be introduced. Nor is this a situation where Frankel joined the conspiracy late in the game and then played only a minor role in it. Rather, this is a situation where Frankel is charged with having directly conspired with the Teicher defendants and with furthering the goal of the conspiracy in significant respects vis-a-vis the misappropriation of information on the Drexel phantom list. It is true that evidence will be introduced at trial that can be considered only as against one defendant or the other, but proper limiting instructions will reduce any resultant prejudice.

Contrary to Frankel's argument, the goal of judicial economy would not be served by yet a third trial in this case. Many of the same witnesses called at the trial of Yagoda and MS & Co. will again be called to testified at this second trial and to require them to appear and give testimony at a third trial can hardly be termed efficient.

Joint trials play a vital role in the criminal justice system, accounting for almost one third of federal criminal trials in the past five years.... Many joint trials ... involve a dozen or more codefendants.... It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes ..., that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes the trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials

generally serve the interest of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

*Richardson v. Marsh,* 481 U.S. 200, 209–10, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987) (Scalia, J.).

The Teicher defendants make the argument that severance is necessary to prevent prejudicial spillover from the obstruction and perjury charges. Frankel's argument fails in this context for the reasons that I declined to sever the perjury and obstruction counts from the indictment for trial at a later date.

### B. *"Finkelstein"* Claim

Frankel further moves for severance under *United States v. Finkelstein,* 526 F.2d 517, 523–24 (2d Cir.1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976), on the grounds that he is entitled to Teicher's exculpatory testimony. The factors to be considered in evaluating such a claim are as follows:

> (1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege ... (2) the degree to which the exculpatory testimony would be cumulative ... (3) the counter arguments of judicial economy ... and (4) the likelihood that the testimony would be subject to substantial, damaging impeachment....

(citations omitted).

▆ Frankel clearly has not made the requisite showing that Teicher would waive his fifth amendment privilege and testify at Frankel's trial, nor has he sufficiently demonstrated that Teicher's testimony would be exculpatory. In his motion papers, Frankel characterizes the chance of Teicher's testifying at a trial of Frankel alone as follows: "Mr. Teicher would be tried first, and we therefore believe he would be available to testify at Mr. Frankel's trial be-

cause Mr. Teicher's own trial would have been concluded." Memorandum in Support of Frankel's Motion to Sever at 32. Frankel further states that Teicher "should" be available to testify at a trial of Frankel if that trial were scheduled after that of Teicher. Reply Memorandum in support of Frankel's Motion to Sever at 16. One does not find in these statements of belief, albeit made in good faith, representations grounded in objective fact that Teicher would testify at a trial of Frankel, nor that his testimony would be exculpatory.

Frankel relies heavily on *United States v. DePalma,* 466 F.Supp. 920 (S.D.N.Y. 1979) in support of his *Finkelstein* motion. However, in that case, unlike that at bar, affidavits by the codefendant establishing his willingness to testify and the substance of his testimony were received and considered by the trial court in its decision to sever trial of the defendants.

> Goodman has submitted to this court an affidavit by Weisman stating that he would waive his Fifth Amendment privilege, and testify at a separate trial of Goodman, if that trial were subsequent to Weisman's own trial. The affidavit also sets forth the substance of Weisman's proposed testimony. Further, at a voir dire before this court, Weisman took the stand and, under cross-examination by the Assistant United States Attorney, re-affirmed that his affidavit was based on personal knowledge and his willingness to waive his Fifth Amendment privilege and testify at a trial subsequent to his.

*DePalma, supra* at 922 (citation omitted).

I now examine the other factors to be considered on a *Finkelstein* claim. Frankel argues, and the government does not really contest, that Teicher's testimony as to his own conversations with Salsbury, which allegedly concerned the Drexel phantom list and Frankel's participation in the misappropriation of information on that list, would not be cumulative. That is clearly so. Teicher is the only other participant to those conversations and his description of what was said, particularly where it may differ from the account given

by Salsbury, cannot be said to be cumulative of Salsbury's summary of those conversations.

As for judicial economy, Frankel again argues that that goal would be furthered by a severance in this action. I disagree for the reasons stated *supra* in connection with the Rule 14 motion.

The likelihood that Teicher's testimony would be subject to substantial, damaging impeachment does not way heavily in favor of or against severance. Teicher's testimony would certainly be subject to impeachment insofar as the government would question him in respect of his trading in the securities of companies listed on the Drexel phantom list. Further impeachment testimony would no doubt be offered in the form of the simultaneous trading of Teicher and Frankel in one security, American Brands, a stock about which both were allegedly tipped by David, and the private conversation between Teicher and Frankel at Teicher's office on the day of the American Brands trading. Of course, the testimony given by Salsbury as to the substance of his conversations with Teicher would also be subject to substantial impeachment in the form of questioning concerning Salsbury's psychiatric history. Neither witness' credibility is beyond reproach, and that factor does not weigh heavily into the determination.

In sum, the *Finkelstein* claim fails primarily because Frankel has made no showing that Teicher would testify at Frankel's trial, nor has there been any proffer as to the substance of Teicher's testimony. In addition, considerations of judicial economy weigh against a severance. As to the cumulative nature of the testimony, and the likelihood that Teicher's testimony could be substantially impeached, neither factor weighs heavily into the calculus.

## VII. Prejudicial Surplusage

Frankel moves pursuant to Rule 7(d) to strike "prejudicial surplusage" from the indictment. The various areas of concern are addressed below.

### A. *Paragraph 19*

Frankel argues that his name should be stricken from paragraph 19.[16] That paragraph serves as the opening paragraph in respect of Counts 14–22, nine mail fraud counts naming Teicher alone as a defendant. Frankel contends that to include his name in paragraph 19 serves no purpose other than to impermissibly allow an inference by the jury that Frankel is accused of nine separate counts of mail fraud, with which he is not charged. The government responds by pointing out that Count 23, the mail fraud count as to Frankel, incorporates the allegations of paragraph 19 by reference.

▪ Paragraph 21, the introduction to Count 23, incorporates the allegations of paragraphs 2 through 7, 12, 13, and 19. Paragraphs 2 through 7 provide background information to the conspiracy, paragraph 12 sets forth the objects of the conspiracy, and paragraph 13 enumerates the overt acts committed in furtherance of the conspiracy. The necessary background to and explanation of the scheme charged in Count 23 is thus thoroughly set forth by reference to these other paragraphs. No relevant information is added to the indictment by the inclusion of Frankel's name in paragraph 19, the introduction to nine substantive allegations with which he is not charged. Frankel's name must therefore be stricken from paragraph 19 of the indictment. *United States v. DeFabritus*, 605 F.Supp. 1538, 1547 (S.D.N.Y.1985) (where "language does not add anything to the charges in the indictment and would lead the jury to draw improper inferences regarding other crimes not charged in the indictment", it should be stricken).

**16.** Paragraph 19 states as follows:

From on or about October 1, 1985, through on or about April 30, 1986, in the Southern District of New York and elsewhere, the defendants VICTOR TEICHER and ROSS S. FRANKEL and others to the Grand Jury known and unknown unlawfully, knowingly, and wilfully did devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, as alleged above.

I note, however, that in striking Frankel's name from paragraph 19, I foreclose no proof by the government on the mail fraud charge contained in Count 23.

### B. *Paragraphs 13(1), 13(4), 13(7), and 13(32)*

Frankel seeks to strike inclusion of his name in paragraphs 13(1), 13(4), 13(7), and 13(32), all of which allege that "the defendant ROSS S. FRANKEL and co-conspirator Robert Salsbury learned that [the specified security] had been placed on the Drexel Burnham phantom list." Frankel contends that the indictment nowhere alleges that he conveyed the phantom list information to defendant Teicher, and that reference to his knowledge of certain securities having been placed on the list adds nothing relevant to the indictment, and serves further to associate him with crimes with which he has not been charged. That argument ignores the allegations of paragraph 12, the means of the conspiracy.

Specifically, paragraph 12(c) alleges that one means of the conspiracy was the misappropriation by Frankel and Salsbury of information on Drexel's phantom list. Moreover, paragraph 12(d) alleges that Salsbury disclosed the misappropriated information to Teicher at times on his own initiative, but at times at Frankel's direction. Therefore, Frankel's assertion that the indictment does not allege his participation in tipping information on the phantom list to Teicher is specious.

### C. *Paragraphs 13(14), 13(17), 13(27)*

█ Frankel challenges the inclusion of his name in paragraphs 13(14) and 13(17) of the indictment, both overt acts alleged in furtherance of the conspiracy. Subparagraphs 14 and 17 allege that David conveyed material non-public information concerning American Can and Avondale Mills to Salsbury who in turn gave the information to Frankel. However, Frankel argues that because the indictment nowhere charges that he traded on the information, the inclusion of his name as a tippee serves no purpose but to prejudice his defense. It is true that Frankel is not charged with illegally trading on inside information in respect of American Can and Avondale Mills, but the government is entitled to allege and offer proof of his participation as a tippee in the larger insider trading conspiracy.

█ Paragraph 13(27) alleges as an overt act conversations between Frankel and Teicher, and between Frankel and David. Frankel attacks inclusion of that allegation on the grounds that the indictment nowhere alleges that the conversation was in anyway illegal. However, it is hornbook law that overt acts need not themselves be illegal in order to further the conspiracy. On its face, subparagraph 27 cannot be deemed mere surplusage.

## VIII. Discovery Issues

### A. *Brady Impeachment Material*

Defendants request that this Court direct the government to produce all material which could be used to impeach the government's witnesses. The Teicher memorandum enumerates the categories of impeachment material as follows:

(1) all the witnesses' prior criminal records, (2) records of prior bad acts by witnesses, (3) any cooperation agreements entered into with the witnesses, (4) the records of any physical or mental disease, disability or disorder of any government witness, (5) a record of inconsistent statements made by the government's witnesses, (6) letters written to the sentencing court on behalf of David, Solomon or Salsbury, (7) records concerning David, Solomon or Salsbury's educational background.

Supplemental Teicher Memorandum at 89–90.

█ The government does not contest its obligation to produce such impeachment material under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), but objects to defendants' request for immediate production. The government proposes to "make the impeachment material available to the defendants on the same basis as it will make '3500 material' available." Government's Memorandum in

Opposition at 56. This is all the case law requires. *See, e.g., United States v. Nixon*, 418 U.S. 683, 701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974) ("[g]enerally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial"); *United States ex rel. Lucas v. Regan*, 503 F.2d 1, 3 n. 1 (2d Cir. 1974) ("[n]either *Brady* nor any other case we know of requires that disclosures under *Brady* be made before trial"), *cert. denied*, 420 U.S. 939, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975); *United States v. Biaggi*, 675 F.Supp. 790, 812 (S.D.N.Y.1987) (" '[i]nformation bearing on a witness' credibility, such as grants or promises of immunity, plea bargain arrangements, or other consideration promised by the Government in return for testimony must be turned over at the same time as other 18 U.S.C. § 3500 materials.' ") (citations omitted); *United States v. Abrams*, 539 F.Supp. 378, 390 (S.D.N.Y.1982) ("*Brady* ... does not require the government to disclose information pertaining to the credibility of witnesses before that witness testifies") (citations omitted). Defendants' motion to compel immediate production of *Brady* impeachment material is denied.

### B. *Witness List*

Defendants further move for an order compelling disclosure by the government of the names and addresses of all those witnesses it intends to call at trial. The trial court can, in its discretion, grant such a request pursuant to Fed.R.Crim.P. 16. However, the government should not be required to produce a witness list unless the defendant has made "a *specific* showing that disclosure [i]s both material to the preparation of his defense and reasonable in light of the circumstances surrounding his case." *United States v. Cannone*, 528 F.2d 296, 301 (2d Cir.1975) (emphasis in original). Indeed, where "the defense ma[kes] only an abstract, conclusory claim that such disclosure [i]s necessary to its proper preparation for trial", the grant of an application for a witness list is an abuse of the trial judge's discretion. *Id.* at 301–02.

Here, the defendants have done no more than make those sorts of conclusory statements which formed the basis for the Second Circuit's admonishment of the trial court in *Cannone*. In essence, the defendants complain that the indictment is confusing and therefore a list of the government's witnesses is essential to proper case preparation. Frankel grounds his request in his characterization of the indictment as "baffingly opaque", Frankel Discovery Memorandum at 22, while the Teicher defendants view the need for a witness list as stemming from "the confused state of insider trading law and the undue multiplication of counts in the indictment." Supplemental Teicher Memorandum at 96.

Moreover, whatever need may exist for the government's witness list, a need which is not sufficient to compel production, is greatly lessened by the fact that the identity of many of the witnesses is readily available to the defendants. That is so because the defendants have ready access to the transcripts of and therefore identity of witnesses called in the prior trial of Marcus Schloss & Co. ("MS & Co.") and D. Ronald Yagoda. Indeed, the Teicher defendants reveal their knowledge of this very fact in their brief where they say the following: "many of the witnesses who will be called to testify at the Teicher defendants' trial already have been called to testify at the earlier trial of Marcus Schloss and Yagoda." *Id.* at 97.

Furthermore, defendants' motion for the production of certain documents concerning the psychiatric history of Robert Salsbury, an application which I dealt with in a prior opinion, reveals their awareness of the identity of at least one potential witness who was not called to testify in the trial of MS & Co. and Yagoda. In these circumstances, I do not view the defendants to have made the requisite showing for the production of the government's witness list. Accordingly, that application is denied.

### C. *Abuse of the Grand Jury; Rule 6(d-f)*

Frankel moves for the production of various information concerning the grand jury.

Specifically, Frankel makes the following demands:

(a) Whether any persons were present during grand jury proceedings other than the grand jurors, witnesses, court reporters, Assistant United States Attorneys, and Special Attorneys.

(b) Whether any grand jury materials, including grand jury transcripts or any documents or information produced to the grand jury, were disclosed or released to any person other than the grand jurors, witnesses, court reporters, Assistant United States Attorneys, and Special Attorneys.

(c) The impanelment and adjournment dates of each grand jury that heard evidence concerning this case.

(d) The instructions provided to the grand jury before the indictment was returned.

(e) The record (*i.e.*, transcript) of return of the indictment.

(f) The time and date of return of the indictment and the number of grand jurors present.

(g) The dates that those members of the grand jury were present during the presentation of evidence and the dates on which those grand jurors were not present during the presentation of evidence.

Frankel Discovery Memorandum at 19.

Frankel makes these rather sweeping requests on the grounds that he believes that "significant exculpatory evidence was not presented to the grand jury." *Id.* at 20. In support of that contention, I am referred to Point IV of the Memorandum of Law in Support of Defendant Frankel's Motion to Dismiss. That reference brings me to a discussion of the government's alleged failure to bring issues of its own witnesses' credibility to the attention of the grand jury. Specifically, Frankel argues that evidence of Salsbury's psychiatric record should have been presented to the grand jury. I therefore turn to the question of whether the government was obligated to present such evidence.

It is true that the "government ... is subject to certain restrictions on its relationship with the grand jury and the type of evidence it may present to obtain an indictment." *United States v. Guillette*, 547 F.2d 743, 752 (2d Cir.1976) (citations omitted), *cert. denied*, 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977). For instance, "where the government knows that perjured testimony has been given to the grand jury and that this testimony is material to the grand jury's deliberations, due process requires that the prosecutor take such steps as are necessary to correct any possible injustice." *Id.* 547 F.2d at 752–53 (citation omitted). However, this is not such a situation. The government had no reason to believe and indeed affirmatively disbelieves that the testimony it presented to the grand jury was false in any material respect. The question is simply whether the government had a duty at the time of the grand jury proceedings to impeach its own witnesses. Although the government is required to present evidence to the grand jury "which tends to establish that the alleged criminal act did not occur", *United States v. DePalma*, 461 F.Supp. 778, 796 (S.D.N.Y.1978), it is under no "legal obligation to present exculpatory evidence to the grand jury." *Id.* (citations omitted).

> If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.

*Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956) (footnote omitted).

■ Clearly, the government is not required to present impeachment material to

the grand jury. That is a job for Frankel's counsel, should he be so advised, at the time of trial, an adversary proceeding governed by the Federal Rules of Evidence. In consequence, Frankel is not entitled to the extraordinary relief which he seeks, relief "which is authorized 'upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.'" *United States v. Wilson*, 565 F.Supp. 1416, 1436 (S.D.N.Y.1983) (*quoting* Rule 6(e)(3)(C)(ii)) (Weinfeld, J.), *aff'd*, 750 F.2d 7 (2d Cir. 1984), *cert. denied*, 479 U.S. 839, 107 S.Ct. 143, 93 L.Ed.2d 85 (1986). Frankel's motion to compel disclosure of the grand jury minutes and other information relating to the grand jury is denied.[17]

### D. *Bill of Particulars*

█ It is hornbook law that "[t]he proper scope and function of a bill of particulars is to inform the defendant of the facts essential to the preparation of his or her defense, to prevent unfair surprise, and to foreclose a second prosecution for the same offense." *United States v. Biaggi*, 675 F.Supp. 790, 809 (S.D.N.Y.1987) (*citing Wong Tai v. United States*, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545 (1927)). Indeed, "[a] bill of particulars should only be required where the charges of an indictment are so general that they do not advise defendant of the specific acts of which he is accused." *United States v. Leonelli*, 428 F.Supp. 880, 882 (S.D.N.Y.1977) (citation omitted). The instant indictment clearly passes muster.

The Teicher defendants move for the particularization of the following information:

1. State whether any money or other thing of value or any form of consideration was exchanged between or among any alleged conspirator and set forth the nature or value of such consideration and when, where and how any such exchange occurred.

Supplemental Teicher Memorandum at 82. The Teicher defendants also move in respect of two other requests, but the

government has since provided the information demanded, rendering that portion of the motion moot. The remaining request is no more than a "demand for the government's evidence in advance of trial." *United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir.1974), and the "law does not impose an obligation [on the government] to preview its case or expose its legal theory." *Leonelli, supra* at 882. The request is denied.

Frankel also moves to compel the government to provide a bill of particulars. Frankel's requests are divided into five groups, the first of which is termed "Information Pertaining to the Substance of Alleged Inside Information." *See* Frankel Discovery Memorandum at 6–7. In that category of requests, Frankel seeks specifics of the government's proof. Frankel requests things such as the subject matter of the conversations between Frankel and David, and between Frankel and Teicher. Specific information about the nature of the inside information concerning American Brands is also requested. Frankel further requests detailed information concerning the proof in respect of those charges concerning the "phantom list" maintained by Drexel Burnham Lambert.

The indictment fairly sets forth the basic charges against the defendant and the government is not "'required to disclose ... the manner in which it will attempt to prove the charges.'" *Leonelli, supra* at 882 (citations omitted). Nor does the government have a "duty to disclose the precise manner in which the crimes alleged in the indictment were committed." *Id.* This sort of discovery, an attempt to ascertain the details of the government's proof and the legal theory it intends to pursue at trial, is not obtainable through a bill of particulars. *Wilson, supra* at 1439.

As to the next category of requests, termed "Information Relating to the Elements and Theories of the Alleged Offenses", Frankel Discovery Memorandum at 8, the government has sufficiently responded to those requests which are prop-

---

17. Frankel further moves for dismissal of the indictment on the grounds of abuse of the grand jury process. That motion is also denied for the reasons discussed in text *supra*.

er. The remaining three requests, 4, 10 and 11, again seek evidentiary detail not properly the subject of bill of particulars. Specifically, Frankel seeks an accounting of the amount by which he was allegedly enriched by the conspiracy, names of other persons and entities not specifically set forth in the indictment, and specifics of the government's case concerning the alleged securities fraud.

The next three groups of requests are as follows: "Information Relating to Mr. Frankel's Entry into the Alleged Conspiracy", "Information Regarding Overt Acts", and the "Objects of the Conspiracy not Specifically Articulated in the Indictment". In this series of requests, defendant seeks "names, dates and places for the entire case", again an improper request. *Leonelli, supra* at 882.

> The extensive indictment, setting forth in detail the nature of the charges and the listing of overt acts with details as to persons, dates and places, fully satisfies the requirements set forth in *Wong Tai v. United States*, 273 U.S. 77, 80–81, 47 S.Ct. 300, 301–302, 71 L.Ed. 545 (1927).

*Wilson, supra* at 1438 (citations omitted). As to the defendant's blanket requests concerning the specifics of the conspiracy charge, it is well settled that such requests are improper.

> The existence of a conspiracy and a defendant's participation therein is usually established by circumstantial evidence based upon independent proof of each alleged co-conspirator's acts, conduct and statements and the totality of conduct of all the participants and the reasonable inferences to be drawn therefrom. To require the Government to specify the exact date when and the place where a particular defendant knowingly attached himself to the claimed conspiracy, the name of the person with whom he conferred about joining the conspiracy, and

the other items on this subject sought by the defendants would unduly restrict the Government's proof. Particulars as to the formation of a conspiracy have almost uniformly been denied.

*United States v. Kahaner,* 203 F.Supp. 78, 84 (S.D.N.Y.1962) (citations omitted) (Weinfeld, J.).

Moreover, in this unique situation where much of the government's proof has, in essence, been previewed for the defendants vis a vis the prior trial of MS & Co. and Yagoda, any need that might otherwise exist for the requested information is greatly lessened.

Defendants' request for a bill of particulars is denied in its entirety.

### Conclusion

The motions of the Teicher defendants are denied in their entirety.[18]

The motions of defendant Frankel are denied in part and granted in part.

The government is directed to proceed in conformity with this opinion.

The foregoing is SO ORDERED.

---

**18.** In addition to the motions discussed in text, the Teicher defendants move for dismissal of Counts 12 and 13. Those counts charge violations of 15 U.S.C. §§ 78n(e) and 78ff; and 17 C.F.R. § 240–14e–3(a) based on an insufficient allegation of scienter and because Rule 14e–3 constitutes an impermissible extension of the

SEC's rulemaking power. MS & Co. and Yagoda made these same arguments prior to trial. I denied those motions and do so now for the reasons stated in *Marcus Schloss, supra* at 955–57. The Teicher defendants move for dismissal at this time in order to preserve the point on appeal. It is preserved.