UNITED STATES of America

v.

**VICTOR TEICHER & CO., L.P.,**
**Victor Teicher and Ross S.**
**Frankel, Defendants.**

**No. 88 Cr. 796 (CSH).**

United States District Court,
S.D. New York.

Feb. 25, 1992.

---

Roger S. Hayes, Acting U.S. Atty., S.D.N.Y. (John W. Auchincloss II, Asst. U.S. Atty., of counsel), New York City, for U.S.

Morvillo, Abramowitz & Grand, P.C. (Robert G. Morvillo, Robert J. Anello, Catherine M. Foti, of counsel), New York City, for defendants Victor Teicher & Co., L.P. and Victor Teicher.

Bernstein & Milner (Michael M. Milner, Roger J. Bernstein, of counsel), New York City, for defendant Ross S. Frankel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This case is before the Court on defendants' post-trial motions for judgments of acquittal pursuant to Fed.R.Crim.P. 29(c), or, alternatively, for a new trial pursuant to Fed.R.Crim.P. 33.

On November 11, 1988 the defendants, as well as D. Ronald Yagoda and Marcus Schloss & Co. Inc., were charged in a 31—count indictment charging, *inter alia,* conspiracy, securities fraud, mail fraud and perjury. Yagoda and Marcus Schloss were severed out and tried separately in May 1989. *See United States v. Marcus Schloss & Co., Inc.,* 710 F.Supp. 944, 945 (S.D.N.Y.1989). The indictment was redacted to eliminate these defendants.

Defendants were tried before this Court and a jury from January 19, 1990 through April 6, 1990.

Defendants first made Rule 29 motions for dismissal of all counts at the close of the government's case and Counts 13, 14, 15, 16 and 19 were dismissed, although the other counts were allowed to stand. *See United States v. Victor Teicher & Co., L.P., et al.,* 88 Crim. 796 (CSH), Memorandum Opinion and Order, 1990 WL 29697 (S.D.N.Y. March 9, 1990) ("3/9/90 slip op."). The indictment given to the jury in

this case was further redacted to reflect the dismissals of these counts.

Count 1 of the indictment charged that from July 1, 1985 to on or about April 30, 1986 defendants Victor Teicher & Co., L.P., Victor Teicher ("the Teicher defendants") and Ross S. Frankel conspired, in violation of 18 U.S.C. § 371, to commit securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b–5; fraud in connection with a tender offer in violation of 15 U.S.C. §§ 78n(e) and 78ff and 17 C.F.R. § 240.14e–3(a); and mail fraud in violation of 18 U.S.C. § 1341. Counts 2 through 10 charged the Teicher defendants with securities fraud with respect to certain securities in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b–5 and 18 U.S.C. § 2. Count 8 charged defendant Frankel with securities fraud with respect to one of those securities, American Brands, Inc. Counts 11 and 12 charged the Teicher defendants with fraud with respect to the tender offer by Dominion Textile Company, Ltd. for Avondale Mills in violation of 15 U.S.C. §§ 78n(e) and 78ff, 17 C.F.R. § 240.14e–3(a) and 18 U.S.C. § 2. Counts 13 and 14 charged Victor Teicher with mail fraud in violation of 18 U.S.C. §§ 1341 and 2. Count 15 charged Frankel with mail fraud in violation of 18 U.S.C. § 1341. Count 16 charged Frankel with four specifications of perjury before the Securities and Exchange Commission ("S.E.C.") in violation of 18 U.S.C. § 1621. Counts 17 and 18 charged Frankel with obstruction of justice in violation of 18 U.S.C. §§ 1505 and 2.

On March 23, 1990, at the conclusion of all the evidence in the case, defendants again moved for judgments of acquittal under Rule 29. The Court reserved decision on the defendants' motions. Transcript of Trial January 19, 1990—April 6, 1990 ("Tr.") at 6730.

On April 6, 1990 the jury returned verdicts of guilty against Victor Teicher & Co., L.P. and Victor Teicher on Counts 1–12, against Victor Teicher on Counts 13 and 14 and verdicts of guilty against Frankel on Counts 1, 8 and 15–18.

On May 2, 1990 the United States Court of Appeals for the Second Circuit issued its decision in *United States v. Chestman*, 903 F.2d 75 (1990), *rev'd in part and aff'd in part*, 947 F.2d 551 (2d Cir.1991), *petitions for cert. filed* (U.S. Jan. 1 and 2, 1992) ("*Chestman I*"), reversing Rule 10b–5, Rule 14e–3, mail fraud and perjury convictions obtained after a jury charge substantially similar to the charge in the case at bar. On May 14 and 21, 1990 the Teicher defendants and Frankel, respectively, filed post-trial motions for judgments of acquittal under Rule 29 or, in the alternative, for a new trial under Rule 33.

On August 24, 1990 the Second Circuit granted rehearing *en banc* of *Chestman I* and this Court deferred decision on the pending post-trial motions until the Second Circuit's *en banc* ruling.

On October 7, 1991 the Second Circuit issued its *en banc* decision. *United States v. Chestman*, 947 F.2d 551 (2d Cir.1991), *petitions for cert. filed* (U.S. Jan. 1 and 2, 1992) ("*Chestman II*"). *Chestman II* reversed in part and affirmed in part the panel's decision. Based on the *en banc* decision in *Chestman II* the defendants have filed briefs and letter-briefs supplementing the post-trial motions. Defendants' motions are now fully briefed and ripe for decision.

For the reasons set forth below, defendants' motions are denied.

## BACKGROUND

To the extent that defendants challenge the sufficiency of the evidence against them, the standard of review is clear.

The evidence at trial, viewed in the light most favorable to the government, *see United States v. Simmons*, 923 F.2d 934, 953 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 383, 116 L.Ed.2d 334 (1991), established the facts as follows.

Defendant Teicher was the principal of defendant Victor Teicher & Co., L.P., a securities firm. The evidence showed that Teicher received confidential information concerning the securities of publicly traded companies from co-conspirators Michael

David of the law firm of Paul Weiss Rifkind Wharton & Garrison and Robert Salsbury of the investment firm Drexel Burnham Lambert.

The evidence showed that Teicher received confidential information about the names of companies on the Drexel "phantom list." This list contained the names of companies that Drexel was not to trade in because the firm was working on transactions involving them. Tr. 4728–29. Salsbury testified that Teicher repeatedly asked him for the identity of companies on the list. Salsbury initially resisted giving Teicher the names on the list, and when he did reveal the names he told Teicher that he should not disclose the information to any other person. Tr. 2253, 3018, 3031–33.

The evidence showed that while working at Salomon Brothers in the late 1970s, Teicher became familiar with what Salomon Brothers called a "restricted list." This list contained a list of stocks in which Salomon Brothers was not permitted to trade.[1] Tr. 6287–6293.

In late February and March 1986, Teicher purchased stocks in companies within a day or on the day that the company was placed on the Drexel phantom list. On March 14, 1986 Teicher purchased $710,000 worth of Warnaco stock on the day after Warnaco was added to the Drexel phantom list. The government also proved that Teicher had traded in other Drexel phantom list stocks, namely Republic Airlines (Count 2) and Westchester Financial Services Corporation (Count 3). GX 81 B.

The evidence also showed that Teicher received material nonpublic information that Michael David had misappropriated from Paul Weiss and its client Triangle Industries. During his direct testimony David stated:

I said [to Teicher that] I had learned within Paul Weiss that American Can at sometime in the future may become a takeover target by a Paul Weiss client, Triangle Industries, but that was uncertain at that time.... I said, if it

would happen at all it would happen within six months.

Tr. 287–88.

On redirect examination David testified that:

While I conveyed to him that it came from Paul Weiss, I did not mention the actual source of my information. That's Mr. Lee Pershan, the actual lawyer I talked to or I learned it from.... I not only told him that Triangle Industries would take over American Can at sometime in the future, depending on certain antitrust barriers, but I also conveyed to him in words which I don't recollect that that information came from Paul Weiss.

Tr. 767–68.

The evidence showed that on March 11, 1986 Michael David told Teicher, in a conversation which took place in Teicher's office, that Paul Weiss was working on a deal involving Revco. Up to this point David had tipped Teicher on four previous Paul Weiss deals, with a tip on American Brands having been given the day before.

David testified that on the morning of March 11, 1986 he "told [Teicher] that the price of the buyout was supposed to go to thirty-five and only thirty-five and that the stock was trading a little bit too close to $35 a share." David testified that he told Teicher that he had gotten that information either from Andrew Solomon, another co-conspirator, or from Marcus Schloss & Co. Tr. 419, 778. The evidence showed that Teicher acted on the tip that same morning. On March 11, 1986 the opening of Revco trading was delayed because of the announcement of the pending buy-out offer that appeared on the broad tape at 9:57 a.m. Solomon testified that when Solomon's boss Yagoda saw that announcement he told Solomon to tell David to sell Revco stock short because the market price was too high relative to what Yagoda knew about the actual price of the buy-out. Solomon relayed that information to David, who in turn tipped Teicher, who sold 5,000

---

**1.** Although in his own testimony Teicher maintained that he had never even heard of the Drexel phantom list in the period between October 1985 through March 1986, I disregard that denial for the purpose of this analysis.

shares short by 10:21 a.m. Tr. 414, 421, 778, 1214–16.[2]

The evidence showed that Ross S. Frankel was a corporate vice president at Drexel Burnham Lambert doing research analysis in the domestic arbitrage department. In August 1985 Salsbury was hired to do financial analysis in the department. Ronald Geffen was also part of the research analysis team in the domestic arbitrage department. Tr. 4720–4752.

The evidence showed that Salsbury tipped Frankel about American Brands and told Frankel that the information came from Michael David, whose law firm was representing a company, BAT Industries, that was considering a takeover of American Brands. In the days leading up to March 10, 1986 Salsbury had three conversations with Michael David concerning American Brands and Salsbury related each conversation to Frankel. After the first conversation, Salsbury testified that he told Frankel "that Michael's firm is representing a British client in the acquisition of American Brands." Frankel replied by saying "that it was good information, try to get more, and tell Michael to be careful." After the second conversation with David, Salsbury testified that he told Frankel that "Paul Weiss had gone forward and gotten SEC documents ... on American Brands." After the third conversation with David, Salsbury testified that he told Frankel "all the information about who the client was ... I told him in fact that BAT U.S. was the acquirer.... that it was—he knew it came from Paul, we discussed it coming from Paul Weiss." Tr. 2304–06. The evidence showed that Frankel was a lawyer, who had once worked at the firm of Morgan Lewis & Bockius, and was aware of the fiduciary duties lawyers owe to clients. Tr. 4715–17.

On March 10, 1986, after Salsbury relayed his third conversation with David, Frankel purchased ten American Brands call options. Frankel also allowed Salsbury to buy two options in Frankel's account at Drexel Burnham Lambert.

The government also proved a number of incidents from which it was entitled to an inference of knowledge on Frankel's part of the source of inside information. Michael David testified that when Frankel saw David at Teicher's office on March 10, 1986 Frankel warned David to "be a little bit more low key." Tr. 410. Frankel admitted, albeit with a different explanation, that he told David "I don't think you should be playing arb on Paul Weiss's time." Tr. 4888. Frankel testified that he told Salsbury on March 11, 1986 that he had seen David at Teicher's office and that Frankel "thought it was a little strange and not too good an idea." Tr. 5159. Salsbury's version of the conversation is that Frankel "was very upset" and told Salsbury that he "should tell Victor he shouldn't do that any more." Tr. 2314. Sometime later in March 1986 while Salsbury and David spoke on the phone, Frankel told Salsbury to ask David "if it [American Brands] still was on and when it would occur." Tr. 2336.

The evidence showed and the government was entitled to the inference that once an investigation by the S.E.C. began, Frankel attempted a cover-up. Salsbury testified, and was corroborated by Geffen, that Frankel retrieved a check that was Salsbury's payment for his second set of American Brands call options purchased in Frankel's account and that Frankel destroyed the margin slip that accompanied the check. Tr. 2374–76; 4282–85. Salsbury testified that Frankel created a list of lawful reasons for purchasing the American Brands call options and rehearsed Sals-

---

**2.** Teicher's testimony, which does not have to be credited when viewing the evidence in the light most favorable to the government, did little to alleviate the clear implication that he had traded on inside information. According to Teicher, he was familiar with Revco because he had taken a "fly" on it in September 1984 and then he had "taken a look at" Revco again in the summer of 1985. Teicher testified that on the

morning of March 11, David told Teicher that Solomon valued Revco at $35.00 per share. When Teicher said that the felt the stock was worth only $31 to $33 per share, David said, "well, if that's the way you feel, why don't you short some shares?" Teicher testified that he took a look at Revco's price-volume history and sold short 5,000 shares for $168,000. Tr. 6269–72.

bury on those reasons. Tr. 2372–73. Salsbury and Geffen testified that Frankel had instructed Geffen to destroy a page from Frankel's desk calendar that showed the payment by Salsbury. Tr. 2385, 4313. Those same two witnesses testified that Frankel only told in house counsel about the first—but not the second—set of American Brands options purchased by Salsbury and instructed Salsbury to do the same. Tr. 2380–84, 4289–90.

The evidence showed that Frankel gave contradicting statements on whether Salsbury had done research on American Brands in February of 1986 and the government was entitled to the inference that Frankel had committed perjury. *See* Indictment, Count 16, Specifications 1, 2 and 4. During his appearance before the S.E.C. Frankel testified that Salsbury had done research in February 1986 at Frankel's request and that Frankel had not asked Salsbury to do any research on March 10, 1986. In contrast, Salsbury testified that he did no research in February and that the first time Frankel had asked him to do research was after Frankel and Salsbury had purchased American Brands call options on March 10, 1986. Tr. 2318–20. On June 3, 1986 Frankel initially told the S.E.C. that "the Salsbury analysis was before March 10" and that Salsbury "had already done the financial analysis on my request a while before [March 10]." The S.E.C. then confronted Frankel with a memorandum he had written to Drexel's in house counsel Paul Merolla on April 29, 1986. That memorandum, which Frankel had written, stated that "on March 10, 1986, I told Bob that I was considering buying some American Brands calls and asked him to do a brief financial analysis of the underlying common stock." The memorandum mentioned nothing about research being done before March 10, 1986. Tr. 5036–38. When Frankel saw this memorandum at the S.E.C. he stated that it was wrong and said "I don't know why I wrote that." GX 6 at 124.

On June 5, 1986 Frankel gave another version to the S.E.C. and also relied on this version at the trial before this Court. In this version Frankel stated that he had asked Salsbury to do an analysis in February and had only asked him to do an "update" on March 10 to compare American Brand to other tobacco stocks. Tr. 4973, 5048. But the research in Salsbury's notebook on the back of a page dated March 12, 1986 is an analysis of the break-up value of American Brands using 1984 numbers. It makes no mention of any other tobacco companies. Tr. 5048.

On March 23, 1990 the Teicher defendants moved for judgments of acquittal at the conclusion of all of the evidence and argued that the government's evidence was insufficient to convict and that the alleged inside information was immaterial. Memorandum of Law In Support of Teichers' Defendants Motion ("Teicher Trial Mem.") at 1–4.[3] The Court reserved decision on these motions.

In May 1990, following the verdicts of guilty, the Teicher defendants renewed their March 23, 1990 motions for judgments of acquittal on all counts of the indictment. The Teicher defendants also moved for judgments of acquittal as to each count of the indictment based on the Second Circuit's decision in *Chestman I.* The Teicher defendants also moved for judgments of acquittal as to all counts of the indictment on the ground that, when viewed in light of all of the evidence at trial, the testimony of the government's two main witnesses, Michael David and Robert Salsbury was so contradictory and inconsistent on its face that the Court should find their testimony incredible as a matter of law. The Teicher defendants argued that the Rule 14e–3 convictions should be vacated because Rule 14e–3 had been held invalid in *Chestman I.*

In the alternative, the Teicher defendants requested that the Court grant them a new trial. The Teicher defendants argued that even if the Court found that the

---

**3.** Defendant Frankel joined this motion to the extent it related to American Brands. *See* Teicher Trial Mem. at 4 n. 3.

evidence was technically sufficient, the nature of the proof was such that the verdict reached was contrary to the weight of the evidence and should be set aside and a new trial granted under Fed.R.Crim.P. 33. Memorandum of Law in Support of Victor Teicher and Victor Teicher & Co.'s Motion For a Judgment of Acquittal or, Alternatively, For a New Trial ("Teicher Post–Trial Mem.") at 2–3.

After *Chestman II* the Teicher defendants press their 14e-3, sufficiency and materiality arguments. *See* Letter Of Robert J. Anello, Esq. dated December 6, 1991 ("Teicher Supp. Letter").

Defendant Frankel filed a post-trial motion arguing that Frankel was entitled to judgments of acquittal under Fed. R.Crim.P. 29 because of the Second Circuit's decision in *Chestman I.* In the alternative, Frankel asked for a new trial under Fed.R.Crim.P. 33, contending that the verdicts were contrary to the weight of the evidence. Memorandum of Law In Support of Ross Frankel's Motion ("Frankel Post–Trial Mem.") at 2.

Relying on *Chestman II* Frankel argues that there was never a duty of confidentiality proven between Salsbury and David, and accordingly the jury could not have found that such a duty extended to Frankel. Frankel argues that the government never proved that he knew the information was confidential and that, even if he had, knowledge alone is not enough for a conviction under Rule 10b–5. Defendant Frankel's Supplemental Memorandum ("Frankel Supp.Mem.") at 5–7.

After *Chestman I* the government responded that the decision had not changed the elements of Rule 10b–5 liability and that those elements had been proved in this case. The government contended that the evidence was sufficient to convict Frankel of mail fraud, conspiracy and perjury. The government suggested that the defendants be sentenced on the Rule 14e–3 convictions which could then be dismissed if the panel's decision was allowed to stand. Government's Memorandum of Law In Opposition ("Gov.Mem.") at 10–37.

Relying on *Chestman II* the government now argues that it was not required to show that each member of a line of tippees accepted a duty of confidentiality. The government contends that the critical requirement is knowledge that information is confidential and that that element was proved in this case. The government continues to argue that since the mail fraud convictions are related to the securities fraud convictions, which must be sustained, the mail fraud convictions should be upheld. The government notes that *Chestman II* has ended any questions about the validity of Rule 14e–3 and urges that the 14e–3 convictions be upheld. Government's Supplemental Memorandum In Opposition ("Gov.Supp.Mem.") at 2–14.

## DISCUSSION

The standards for reviewing post-conviction motions are well-settled. A defendant challenging the sufficiency of the evidence carries a "very heavy burden." *United States v. Alkins,* 925 F.2d 541, 555 (2d Cir.1991) (citations omitted). A reviewing court "must construe the evidence in the light most favorable to the government and draw all inferences in its favor." *United States v. Teitler,* 802 F.2d 606, 615 (2d Cir.1986) (citations omitted). "[A] jury's verdict will be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *United States v. Scarpa,* 913 F.2d 993, 1004 (2d Cir.1990) (citation omitted). The government is not "required to preclude every reasonable hypothesis which is consistent with innocence." *United States v. Chang An–Lo,* 851 F.2d 547, 554 (2d Cir.) (citation omitted), *cert. denied,* 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). "If '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,' the conviction must be upheld." *United States v. Nersesian,* 824 F.2d 1294, 1324 (2d Cir.) (citing and quoting *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)) (emphasis in original), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987).

"The fact that a conviction may be supported only by the uncorroborated testimony of a single accomplice is not a basis for reversal if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *United States v. Parker*, 903 F.2d 91, 97 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990). "The evidence is to be viewed 'not in isolation but in conjunction.'" *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir.1984) (citation omitted).

## I. Securities Convictions

### A. The Rule 10b–5 Convictions

At the conclusion of the evidence the Teicher defendants moved under Fed. R.Crim.P. 29 for judgments of acquittal on Counts 2, 4, 5, 7, 8, 9, 12, 13, 14. This motion focused on the standard for "materiality" of nonpublic information set forth in this Court's March 9, 1990 opinion denying the Rule 29 motions at the close of the government's case. The Court relied on the Supreme Court's holding in *T.S.C. Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). *See* 3/9/90 slip op. at 2–4. The Teicher defendants argued that false or inaccurate information cannot be material. The Teicher defendants argued that the jury could not find beyond a reasonable doubt that they had been in possession of material information regarding American Can, Allegheny International, American Brands or Revco or regarding Avondale Mills after February 26, 1986. The Teicher defendants contended that the government had failed to show Teicher's knowledge of any harm from his claimed improper conduct with regard to Revco and Republic. In addition, the Teicher defendants contended that the government had failed to establish that trading in Avondale was directed by Teicher. Teicher Trial Mem. 3–23.

In their post-trial motion the Teicher defendants, relying on *Chestman I*, argued that the government's evidence was insufficient to support convictions under Rule 10b–5. The Teicher defendants maintained that there was insufficient evidence to prove that they knew the information concerning Revco, the companies on the phantom list (Republic, Westchester and Warnaco) and American Can was confidential. In addition, the Teicher defendants contended that the information concerning American Can, Allegheny, American Brands and Revco could not be material because it was inaccurate. The Teicher defendants argued that the government presented insufficient proof of a single conspiracy. The Teicher defendants contended that the government's proof was insufficient to demonstrate that Teicher ordered trading in Avondale Mills. The Teicher defendants argued that the mail fraud convictions had to be overturned because the information was inaccurate and so could not be properly. Teicher Post–Trial Mem. at 5–25.

The Teicher defendants argue that under *Chestman II* the evidence at trial was insufficient to prove that Teicher knew the information as to Revco, the companies on the phantom list and American Can was confidential and so was guilty of a violation of Rule 10(b)–5. In addition, the Teicher defendants maintain that there is no fiduciary duty with regard to false, stale or inaccurate information. *See* Teicher Supp. Letter. at 3.

Frankel's post-trial motion challenged the convictions under Counts 8 and 15 for securities and mail fraud related to trading in American Brands, Inc. Relying on *Chestman I*, Frankel argued that the government had presented insufficient evidence that Salsbury accepted a duty of confidentiality on Paul, Weiss information from David and that Frankel knew that Salsbury was breaching any duty when he provided information to Frankel about the possible acquisition of American Brands. In addition, Frankel argued that there was no evidence that Frankel was ever advised by anyone that the Paul, Weiss information from Salsbury was confidential and had been divulged in violation of a fiduciary duty. Frankel Post–Trial Mem. at 8.

After *Chestman II* Frankel presses the argument that his Rule 10b–5 conviction on Count 8 must be vacated. Frankel argues that since there was no fiduciary relation-

ship between Salsbury and David and no express acceptance of a duty of confidentiality by David, the government had to show an implied acceptance of duty by Salsbury. Frankel argues that no such evidence was offered. Frankel contends there was no evidence David told Salsbury that the information was confidential and no evidence that Frankel ever knew Salsbury was breaching a duty of confidentiality, even if there was such a duty. Frankel argues that the government never proved he knew the information was confidential and that even if the government had proved such knowledge, knowledge alone is insufficient to sustain 10b–5 liability. Frankel Supp.Mem. 4–7.

The government argues that *Chestman II* reaffirmed the existing standard for Rule 10b–5 liability that was used in this trial. The government contends that it must prove that the misappropriator violated a fiduciary or similar duty and that the tippee knew of the breach. The government argues that there was ample evidence that Teicher knew the information on Revco, the Drexel phantom list and American Can was confidential. The government rejects defendants' contention that some of the information was not material. As to Revco and American Can, the government points to David's testimony that he told Teicher the information was confidential. Regarding the Drexel phantom list the government points to Salsbury's reluctance to reveal the contents of the list and Teicher's knowledge about such lists. Gov. Supp.Mem. at 9–11.

The government argues that the evidence showed that Michael David misappropriated the American Brands information from Paul Weiss and that Salsbury was the intermediary to Frankel. The government rejects Frankel's contention that the government must show that David breached a duty to his firm *and* that Salsbury owed and breached a duty to David *and* that Frankel knew of both duties and breaches. The government contends that it was required to show that David breached a duty and that Frankel knew of that breach. As to David's duty the government argues that his duty was axiomatic as an attorney at Paul Weiss. The government points to Salsbury's testimony, Frankel's previous experience as an attorney, David's testimony and Frankel's cover up attempts as sufficient evidence that Frankel knew David had breached a duty. Gov.Supp.Mem. at 11–13.

1. The Standard for Rule 10b–5 Liability

In *Chestman II* the Second Circuit reviewed the standard for criminal liability under Rule 10b–5.[4] The Second Circuit stated the facts of *Chestman II* as follows:

Robert Chestman is a stockbroker. Keith Loeb first sought Chestman's services in 1982, when Loeb decided to consolidate his and his wife's holdings in Waldbaum, Inc. (Waldbaum), a publicly traded company that owned a large supermarket chain. During their initial meeting, Loeb told Chestman that his wife was a granddaughter of Julia Waldbaum, a member of the board of directors of Waldbaum and the wife of its founder. Julia Waldbaum also was the mother of Ira Waldbaum, the president and controlling shareholder of Waldbaum. From 1982 to 1986 Chestman executed several transactions involving Waldbaum restricted and common stock for Keith Loeb. To facilitate some of

---

**4.** 15 U.S.C. 78j(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or any facility of any national securities exchange.... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

17 C.F.R. § 240.10b–5 provides in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme or artifice to defraud, ... or (c) to engage in any act practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

these trades, Loeb sent Chestman a copy of his wife's birth certificate which indicated that his wife's mother was Shirley Waldbaum Witkin.

On November 21, 1986, Ira Waldbaum agreed to sell Waldbaum to the Grant Atlantic and Pacific Tea Company (A & P). The resulting stock purchase agreement required Ira to tender a controlling block of Waldbaum shares to A & P at a price of $50 per share. Ira told three of his children, all employees of Waldbaum, about the pending sale two days later, admonishing them to keep the news quiet until a public announcement. He also told his sister Shirley Witkin, and nephew, Robert Karin, about the sale, and offered to tender their shares along with his controlling block of shares to enable them to avoid the administrative difficulty of tendering after the public announcement. He cautioned them "that [the sale was] not to be discussed," that it was to remain confidential.

In spite of Ira's counsel, Shirley told her daughter, Susan Loeb, on November 24 that Ira was selling the company. Shirley warned Susan not to tell anyone except her husband, Keith Loeb, because disclosure could ruin the sale. The next day, Susan told her husband about the pending tender offer and cautioned him not to tell anyone because "it could possibly ruin the sale."

The following day, November 26, Keith Loeb telephoned Robert Chestman at 8:59 a.m. Unable to reach Chestman, Loeb left a message asking Chestman to call him "ASAP." According to Loeb, he later spoke with Chestman between 9:00 a.m. and 10:30 a.m. that morning and told Chestman that he had "some definite, some accurate information" that Waldbaum was about to be sold at a "substantially higher" price than its market value. Loeb asked Chestman several times that he thought Loeb should do. Chestman responded that he could not advise Loeb that to do "in a situation like this" and that Loeb would have to make up his own mind.

That morning Chestman executed several purchases of Waldbaum stock. At

9:49 a.m., he brought 3,000 shares for his own account at $24.65 per share. Between 11:31 a.m. and 12:35 p.m., he purchased an additional 8,000 shares for his clients' discretionary accounts at prices ranging from $25.75 to $26.00 per share. One of the discretionary accounts was the Loeb account, for which Chestman brought 1,000 shares.

Before the market closed at 4:00 p.m., Loeb claims that he telephoned Chestman a second time. During their conversation Loeb again pressed Chestman for advice. Chestman repeated that he could not advise Loeb "in a situation like this," but then said that, based on his research, Waldbaum was a "buy." Loeb subsequently ordered 1,000 shares of Waldbaum stock.

Chestman presented a different version of the day's events. Before the SEC and at trial, he claimed that he had purchased Waldbaum stock based on his own research. He stated that his purchases were consistent with previous purchases of Waldbaum stock and other retail food stocks and were supported by reports in trade publications as well as the unusually high trading volume of the stock on November 25. He denied having spoken to Loeb about Waldbaum stock on the day of the trades.

*Chestman II,* 947 F.2d at 555.

Based on these facts Chestman was convicted of ten counts of fraudulent trading in connection with a tender offer in violation of Rule 14e–3, ten counts of securities fraud in violation of Rule 10b–5, ten counts of mail fraud and one count of perjury for his testimony before the S.E.C. Chestman was convicted under the "misappropriation theory" which provides that "one who misappropriates nonpublic information in breach of a fiduciary duty and trades on that information to his own advantage violates 10(b) and Rule 10b–5." *SEC v. Materia,* 745 F.2d 197, 203 (2d Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985). As to shares Chestman purchased for Loeb, Chestman was convicted of aiding and abetting Loeb's misappropriation of nonpublic information

in breach of Loeb's duty to the Waldbaums and his wife Susan. For shares Chestman purchased for himself and clients Chestman was convicted as a "tippee" of the same misappropriated information. *Chestman II,* 947 F.2d at 564.

The panel in *Chestman I* reversed all of Chestman's convictions. On the Rule 10b–5 convictions the panel held that there was no evidence that Chestman knew that the information was confidential. The panel stated that there was no evidence that Chestman knew "that Keith Loeb was pledged to secrecy by Susan Loeb, who was pledged to secrecy by Shirley Witkin, who was pledged to secrecy by Ira Waldbaum." *Chestman I,* 903 F.2d at 79. Since Chestman did not know that the information was confidential, the panel reversed the mail fraud convictions. As to the perjury conviction the panel held that the government's proof did not overcome the "two-witness" rule required for perjury convictions. *Id.* at 79–82. While two of the three judges on the panel rejected Chestman's contention that Rule 14e–3 was an invalid exercise of the S.E.C.'s rulemaking authority, the Rule 14e–3 conviction was also reversed. Judge Mahoney found that Rule 14e–3 was invalid and Judge Carman[5] found that the trial court's failure to instruct the jury on the elements of fraud with respect to the Rule 14e–3 charges was reversible error. *Id.* at 86, 88.

In *Chestman II* the *en banc* Second Circuit reinstated the Rule 14e–3 convictions, but agreed with the panel that, on the particular facts of the case, the Rule 10b–5 and mail fraud convictions could not stand. The panel's opinion on all three issues was vacated. The *en banc* court did not rehear the appeal on the perjury conviction so the panel's reversal of that conviction was not disturbed.

The *en banc* court began by canvassing the two strands of Rule 10b–5 liability: the insider trading theory as outlined in *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) and *Dirks*

*v. SEC,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983) and the misappropriation theory of *United States v. Carpenter,* 791 F.2d 1024, 1034 (2d Cir.1986), *aff'd by evenly divided court,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987).

In *Chiarella* the Supreme Court held that

> one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.' 445 U.S. at 228 [100 S.Ct. at 1114] (citation omitted).

The Second Circuit stated that in *Dirks* the Supreme Court "held that tippee liability attaches only when an 'insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach.'" *Chestman II,* 947 F.2d at 565 (citing and quoting *Dirks,* 463 U.S. at 660, 103 S.Ct. at 3264). The *en banc* Second Circuit summarized this theory of liability:

> [b]inding these strands of Rule 10b–5 liability are two principles—one, the predicate act of fraud must be traceable to a breach of duty to the purchasers or sellers of securities, two, a fiduciary duty does not run to the purchasers or sellers solely as a result of one's possession of material nonpublic information.

*Chestman II,* 947 F.2d at 565–66 (footnote omitted).

■ The misappropriation theory imposes Rule 10b–5 liability when an individual "misappropriates material nonpublic information in breach of a fiduciary duty or similar relationship of trust and confidence and uses that information in a securities transaction." *Chestman II,* 947 F.2d at 566 (citations omitted). The Second Circuit has held "that the predicate act of fraud may be perpetrated on the source of the

5. Hon. Gregory W. Carman, Judge of the United States Court of International Trade, sitting by designation.

nonpublic information, even though the source may be unaffiliated with the buyer or seller of securities." *Chestman II*, 947 F.2d at 566 (citing *Carpenter*, 791 F.2d at 1032). The Second Circuit has so far only applied the misappropriation theory in the employment context.[6]

The *en banc* Second Circuit then went on to state that:

[a]fter *Carpenter*, the fiduciary relationship question takes on special importance. This is because a fraud-on-the-source theory of liability extends the focus of Rule 10b–5 beyond the confined sphere of fiduciary/shareholder relations to fiduciary breaches of any sort, a particularly broad expansion of 10b–5 liability if the add-on, a 'similar relationship of trust and confidence,' is construed liberally.

*Chestman II*, 947 F.2d at 567. The Second Circuit noted that a fiduciary duty is not imposed unilaterally when a person is entrusted with confidential information. *Id.* (citing *Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 799 (2d Cir.1980)). The Court noted that certain relationships, among them attorney and client, are hornbook examples of fiduciary relationships. *Id.* at 568. In describing the characteristics of a fiduciary relationship, the Second Circuit stated "[a] fiduciary relationship involves discretionary authority and dependency. One person depends on another—the fiduciary—to serve his interests." *Id.* at 569.

In evaluating the facts of Chestman's conviction, the *en banc* Second Circuit stated the government was required "to establish two critical elements—Loeb breached a fiduciary duty to Susan Loeb or to the Waldbaum family and Chestman knew that Loeb had done so." *Id.* at 570. The Second Circuit found that the government had failed to prove that Loeb was a fiduciary

with respect to the Waldbaum family. The Court rejected the notion that marriage automatically imposed a fiduciary duty and held that Loeb was not shown to have been included in the family business. The *en banc* court reversed the Rule 10b–5 convictions as based on insufficient evidence.[7]

### 2. Sufficiency of the Evidence

#### a. Teicher's Convictions Under Rule 10b–5

Applying the principles of *Chestman II* to the case at bar I have no difficulty concluding that the evidence against Teicher was sufficient to sustain his conviction. The jury was repeatedly instructed that to convict the defendants the government had to show that the defendants had traded on confidential information that they knew had been misappropriated in violation of a duty not to disclose. Tr. 7231–45.

Counts 2, 3 and 10 involved trading in the securities of companies that were on the Drexel phantom list. As an employee of Drexel Burnham Lambert with access to the names of the companies on the list, Robert Salsbury was clearly a fiduciary with respect to Drexel's information whether as a "temporary insider" or as a fiduciary. Salsbury testified that Teicher had pressed him for the names of companies on the list even though Salsbury resisted. When Salsbury finally gave Teicher the information, Salsbury warned Teicher not to reveal the names of companies on the list. The evidence was sufficient to establish that Teicher obtained information from the Drexel phantom list and traded on that information. In addition, Teicher understood from his experience the import of knowing the names of companies on the list. Tr. 2253, 3018, 3031–33, 6287–93. This evidence was more than sufficient for the jury to find that Salsbury had misap-

---

**6.** The Second Circuit noted that a merger of the two theories can occur. The misappropriations addressed in *United States v. Newman*, 664 F.2d 12 (2d Cir.1981), *aff'd after remand*, 722 F.2d 729 (2d Cir.), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983) (investment banker) and *Materia*, 745 F.2d at 203 (employee at printing company) would also fit under the "temporary insider" theory posited in *Dirks*, 463 U.S. at

655 n. 14, 103 S.Ct. at 3262 n. 14. *Chestman II*, 947 F.2d at 566; *see S.E.C. v. Musella*, 578 F.Supp. 425, 439 (S.D.N.Y.1984).

**7.** Holding that Chestman's mail fraud convictions were closely tied to the securities convictions, the *en banc* court vacated the mail fraud convictions as well. *Chestman II*, 947 F.2d at 571.

propriated the information and that Teicher knew the information was obtained in violation of a duty not to disclose and was confidential.

Michael David was clearly a fiduciary with regard to information he learned at Paul Weiss. David was barred from revealing such information whether as a "temporary insider" under the insider trading theory or as a fiduciary under the misappropriation theory.

As to Count 4, David testified that he told Teicher that the information concerning American Can had been obtained from a Paul Weiss client, Triangle Industries. Tr. 287–88, 767–68. This information was more than sufficient for the jury to find that Teicher knew the information had been misappropriated in violation of David's fiduciary duty and was confidential.

The evidence was sufficient to convict Teicher on Count 9 which charged him with Rule 10b–5 violations in regard to shares in Revco. David testified that he was in Teicher's office and told Teicher that the price for the buyout of Revco was only supposed to go up to $35 per share. David told Teicher that the information came from Andrew Solomon or Marcus Schloss & Co., Inc. and Teicher acted on the tip by selling 5,000 shares short. Tr. 414, 421, 778, 1214–16. While Teicher told a different story in his testimony, Tr. 6269–72, the jury had ample evidence to conclude that Teicher knew the information had been improperly obtained from Marcus Schloss & Co., Inc., was confidential, and had been misappropriated.

The Teicher defendants also challenge their convictions on Count 7 on the ground that the evidence did not establish that Victor Teicher directed trading in shares of Avondale Mills on March 14, 1986.[8] The Teicher defendants argue that the government only alleged that Victor Teicher could bind the corporate defendant so that if someone else, namely a Teicher employee named Daniel Hess, ordered the trading in Avondale Mills Teicher & Co., L.P. cannot

be guilty. The Teicher defendants also argue that if Hess ordered trading in Avondale Mills Teicher cannot be guilty on Count 7. Trial Mem. at 13–14; Teicher Post–Trial Mem. at 23; Tr. 6725–29.

The Teicher defendants' argument rests on a unjustifiably narrow view of the evidence at trial, given the light in which the evidence must be viewed on these motions. Hess testified that when David called and told him to buy stock in Avondale Mills Hess went ahead and purchased about 4,000 shares for Victor Teicher & Co., L.P. Hess testified that he made these purchases based on David's call without consulting Victor Teicher. Tr. 2093–94. While these two points in isolation support the arguments of the Teicher defendants, the whole of Hess's testimony gave the jury ample basis to conclude that the trading was done with Teicher's approval.

Hess testified that he had been in the office when Michael David came to the office for two days in March 1986. Hess knew that during this period David helped set up an account at another firm and gave Teicher the tip concerning American Brands. Tr. 2069–84. Hess testified that when David called he asked for Teicher and when he was told that Teicher was not there, he told Hess to purchase shares in Avondale Mills. Tr. 2091–93. Hess testified that on no other occasion did he take a call such as David's and then purchase stock for the firm. In addition, when Hess reported the purchase to Teicher, Teicher was not concerned and said, Hess testified, "it was fine." Tr. 2095–2098. Other witnesses testified that no trading was done without Teicher's approval. Tr. 3502–03, 3507–10, 4025. The jury was entitled to consider Hess's story and conclude that Teicher authorized the purchase. The fact that Teicher then ratified the sale also gave the jury sufficient evidence to conclude that the purchases were made with Teicher's approval in principle, even if the actual call came from Teicher's coconspirator David.

8. The jury was instructed that trades in Avondale Mills on February 27, 1986 and March 7, 10

and 11, 1986 could not be the basis for convictions of the Teicher defendants. Tr. 7229.

### b. Frankel's Conviction Under Rule 10b–5

 The evidence was sufficient for the jury to find Frankel guilty on Count 8 and the related mail fraud count, Count 15. While Frankel argues that the government must show that Salsbury assumed a duty of confidentiality, it is sufficient if the government shows that David breached a duty and Frankel knew of that breach. *See Chestman II,* 947 F.2d at 570. Salsbury testified that he had three conversations with David about American Brands, all of which he relayed to Frankel. Salsbury told Frankel that David's law firm, Paul Weiss, was representing a possible bidder for American Brands. At one point Frankel told Salsbury to caution David to be careful and later asked Salsbury to ask David if the deal was still going to happen. As a former lawyer at a large national law firm Frankel knew well that a lawyer such as David was violating a fiduciary duty by telling Salsbury a client's secrets. Tr. 2304–06, 2336, 4715–17. David's testimony established an incident where Frankel saw David at Teicher's office and Frankel warned him about being seen there. Tr. 410. This evidence gave the jury ample basis to conclude that Frankel knew the American Brands information had been obtained in violation of David's fiduciary duty.

### 3. Materiality

The Teicher defendants', and Frankel as to American Brands, move to vacate the securities and mail fraud convictions on Counts 2 (Republic Airlines), 4 (American Can), 5 (Allegheny), 7 and 12 (Avondale Mills), 8, 13 and 14 (American Brands), 9 (Revco) and 10 (Warnaco) because the information at issue was not material. *See* Teicher Trial Mem.; Teicher Post–Trial Mem. at 17–18, 20–25; Teicher Supp. Letter at 3. The Rule 29 motions relating to materiality are denied for the reasons set forth in this Court's Memorandum Opinion and Order dated December 19, 1989 and Memorandum Opinion and Order dated March 9, 1990. *See United States v. Victor Teicher & Co., L.P.,* 726 F.Supp. 1424, 1431–33 (S.D.N.Y.1989); 3/9/90 slip op. at 2–16. The jury was instructed on the materiality issue. Tr. 7234–36. None of the information lacked materiality as a matter of law and the evidence was sufficient for the jury to reach the conclusion it did.

### B. Rule 14e–3

After the guilty verdicts the Teicher defendants moved for judgments of acquittal on Counts 11 and 12, based on violations of 15 U.S.C. §§ 78n(e) and 78ff and 17 C.F.R. § 240.14e–3(a), because in *Chestman I* one member of the panel held that Rule 14e–3 was an impermissible extension of the S.E.C.'s rulemaking authority and another held that the jury was improperly instructed on Rule 14e–3. *Chestman I,* 903 F.2d at 86, 88 (opinions of Mahoney, J. and Carman, J.). Teicher Post–Trial Mem. at 5–6.

 Despite the fact that *Chestman II* reversed the panel's decision on Rule 14e–3, the Teicher defendants argue that the *en banc* decision was wrongly decided and that Rule 14e–3 is invalid. The Teicher defendants ask this Court to hold that Rule 14e–3 was an improper exercise of S.E.C. rule making authority. Noting that the defendant in *Chestman* will be filing a petition for certiorari, the Teicher defendants urge this Court to invalidate the Rule 14e–3 convictions in order to preserve the issue. *See* Teicher Letter at 1–2.

The government responds that controlling authority in this circuit is that Rule 14e–3 is a valid exercise of the S.E.C.'s rulemaking authority. Gov.Supp.Mem. at 13–14.

In upholding Rule 14e–3(a) the Second Circuit stated:

> based on the plain language of section 14(e) [of the Securities Exchange Act of 1934], and congressional activity both before section 14(e) was enacted and after Rule 14e–3(a) was promulgated, we hold that the SEC did not exceed its statutory authority in drafting Rule 14e–3(a).

*Chestman II,* 947 F.2d at 563. The Second Circuit's holding could not be clearer and is binding on this Court. Consequently, the Teicher defendants' motions for judgments

of acquittal on Counts 11 and 12 are denied.

## II. Mail Fraud

■ In his post-trial motion Frankel argued that the mail fraud count had to be vacated because it was based on the insufficient securities fraud count.[9] Even assuming a fraudulent securities scheme Frankel argued that the mailing of a brokerage house confirmation slip was not integral to or in furtherance of such a scheme. Frankel renews his pretrial motion that Counts 8 and 13 are duplicitous and Count 8 must be dismissed or Counts 8 and 13 merged. Frankel Post–Trial Mem. at 13–15.

Confirmation slips have been held to be integral and in furtherance of mail fraud schemes based on securities fraud. The Second Circuit has stated that such slips can be used to notify other conspirators that purchases have been made, allow other conspirators to keep track of purchases, and help conceal the fraud by maintaining an appearance of normality. *United States v. Grossman*, 843 F.2d 78, 86 (2d Cir.1988), *cert. denied*, 488 U.S. 1040, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989); *see United States v. Marando*, 504 F.2d 126, 129–30 (2d Cir.), *cert. denied*, 419 U.S. 1000, 95 S.Ct. 317, 42 L.Ed.2d 275 (1974).

In the case at bar the confirmation slip for 12 American Brands call options served several purposes. Ten options were Frankel's and two of the options were for Salsbury. The slip confirmed Frankel's ownership and purchase price and confirmed these purchases to Salsbury. The slip also notified Salsbury how much Salsbury owed Frankel. The jury had sufficient evidence before it to conclude that the mailing of the confirmation slip was " 'incident to an essential part of the scheme.' " *Schmuck v. United States*, 489 U.S. 705, 712, 109 S.Ct. 1443, 1447, 103 L.Ed.2d 734 (1989) (citation

omitted). I have no difficulty reaching the same conclusion.

■ Prior to the start of the trial Frankel moved to dismiss the securities and mail fraud counts based on American Brands as duplicative. The Court held that the indictment was not duplicative on its face because the securities count would be proved by use of a securities exchange while the mail fraud count would be proved by use of the mails. The Court noted that if the evidence at trial indicated that the two counts were duplicative, the issue could be revisited after the trial. *See Teicher*, 726 F.Supp. at 1436–37. It is axiomatic that an indictment cannot charge the same offense in two counts. *Whalen v. United States*, 445 U.S. 684, 688, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980). The test for establishing whether two counts are duplicative was set forth by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932):

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

(citation omitted). "[W]hen the *Blockburger* test for multiplicity has been satisfied, and there is no evidence of congressional intent to the contrary, authority to impose cumulative penalties is presumed to be intended." *United States v. Reed*, 639 F.2d 896, 906 (2d Cir.1981) (citation omitted).

The evidence at trial on Count 8 was based exclusively on the use of a national securities exchange for securities fraud with regard to American Brands. American Brands call options were traded on the American Stock Exchange and the parties stipulated that the American Stock Ex-

---

9. Victor Teicher moves to vacate his mail fraud convictions on Counts 13 and 14 because the information on American Brands was not accurate. Teicher contends that inaccurate information cannot be material and so cannot form the basis for a mail fraud conviction. Teicher Trial Mem. at 14–15; Teicher Post–Trial Mem. at 25; Teicher Supp. Letter at 3. Teicher's motion is

denied for the reasons set forth in the Court's previous opinion addressing the materiality of the American Brands information. *See* 3/9/90 slip. op. at 10–12. The jury was entitled to draw the conclusion which it obviously did and the information did not lack materiality as a matter of law.

change was a "national securities exchange." Tr. 3900. The charge to the jury on the securities fraud count focused on the use of a national securities exchange. Tr. 7251–52. Since Count 8 was concerned exclusively with fraud by use of a national securities exchange and Count 13 was concerned exclusively with the use of the mails, Counts 8 and 13 were not duplicative under the *Blockburger* test. Frankel's motion for judgments of acquittal on these counts or a merger of these counts is denied.

## III. Conspiracy

Frankel argues that the conspiracy charge must be retried because the securities and mail fraud convictions must be vacated. Frankel contends that the charged conspiracy had three alleged objectives: securities fraud with respect to American Brands, mail fraud with respect to American Brands and securities fraud with respect to the Drexel phantom list. Frankel argues that where a conspiracy has multiple objectives and the proof as to one or more of those objectives is insufficient the evidence on the unproved part of the conspiracy may have prejudiced the jury. *See United States v. Papadakis*, 510 F.2d 287, 297 (2d Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975). Frankel argues that the evidence involving American Brands could have prejudiced the jury on the Drexel phantom list. Frankel Post–Trial Mem. 16–18. As I have found that the securities and mail fraud convictions stand, there is no need to address this part of Frankel's argument.

Frankel also argues that the indictment alleged multiple conspiracies, including one conspiracy with respect to David and Paul, Weiss information and a second conspiracy with respect to the Drexel phantom list and Teicher.[10] Without the securities fraud and mail fraud counts concerning American Brands, Frankel argues, the jury would have no basis to conclude that there was a single conspiracy involving the phantom list and the Paul Weiss information. Frankel contends that the conspiracy charge must be retried so the jury can be instructed on this issue. *See Nersesian*, 824 F.2d at 1302. Frankel Post–Trial Mem. at 18. As I have held that the securities and mail fraud convictions relating to American Brands will not be vacated, there is no need to reach Frankel's argument on this point.

## IV. Frankel's Perjury Convictions

Frankel was convicted on Count 16 of the indictment which charged him with perjury before the S.E.C. on June 3, 1986. Specification 1 charges that Frankel perjured himself when he testified that he asked Salsbury to do research on American Brands in late February. Specification 2 charges that Frankel committed perjury when he testified that Salsbury did an analysis of American Brands before March 10, 1986. Specification 3 charges that Frankel committed perjury when he testified that on March 10, 1986 Salsbury did not tell him the source of the rumor that American Brands was being taken over by BAT. Specification 4 charges that Frankel committed perjury when he testified that he had not asked Salsbury to do any research on American Brands on March 10, 1986 and that the research was done prior to March 10, 1986.

Relying on the "two witness" rule for perjury convictions, Frankel argues that the evidence was insufficient to convict him of perjury. On Specification 3 Frankel argues that there is no corroboration of Salsbury's testimony that he told Frankel the source of the American Brands information. As to Specifications 1, 2 and 4 Frankel argues that there was no corroborating evidence to establish that Frankel did not ask Salsbury to do research on American

---

**10.** The Teicher defendants also argue for judgments of acquittal on Count 1 because the government did not prove a single conspiracy but rather three distinct conspiracies with no connection between them. Teicher Post–Trial Mem. at 19. This Court held prior to trial that the government had properly alleged a single conspiracy. 12/19/89 726 F.Supp. at 1427–1430. The jury was instructed that it must find a single conspiracy. Tr. 7211–13. A "properly instructed jury" found that there was a single conspiracy, *Nersesian*, 824 F.2d at 1302, and the Court concludes that there was sufficient evidence to support that finding.

Brands prior to March 10, 1986. Frankel Post–Trial Mem. at 19–25.

As the Second Circuit has held,

[i]n prosecutions for perjury, however, it has long been the rule that a conviction may not be obtained solely on the uncorroborated oath of one witness. . . . The rule is satisfied by the direct testimony of a second witness or by other evidence of independent probative value, circumstantial or direct, which is 'of a quality to assure that a guilty verdict is solidly founded.'

*United States v. Weiner*, 479 F.2d 923, 926 (2d Cir.1973) (citations omitted). "The 'two-witness' rule requires that the alleged perjurious statement be established either by the testimony of two independent witnesses or by one witness and corroborating evidence that is 'inconsistent with the innocence of the [defendant]'" *Chestman I*, 903 F.2d at 81 (citations omitted).

"In assessing the sufficiency of the corroborative evidence, two elements are considered: '1) that the evidence, if true, substantiates the testimony of a single witness who has sworn to the falsity of the alleged perjurious statement; 2) that the corroborative evidence is trustworthy.'" *Id.* (citing and quoting *Weiler v. United States*, 323 U.S. 606, 610, 65 S.Ct. 548, 550, 89 L.Ed. 495 (1945)). In construing the requirement that corroborating evidence be "inconsistent with the innocence of the defendant" the Second Circuit has said that it "mean[s] no more than that such evidence must tend to substantiate that part of the testimony of the principal prosecution witness which is material in showing that the statement made by the accused under oath was false." *Weiner*, 479 F.2d at 927–28. "When a jury relies on circumstantial evidence, however, it must be demonstrated that this evidence has 'independent probative value' if 'standing alone.'" *Chestman I*, 903 F.2d at 82 (citing and quoting *United States v. Freedman*, 445 F.2d 1220, 1226 (2d Cir.1971)). In light of these standards the jury in this case was instructed on the "two witness" rule. Tr. 7289–90.

The government's proof on Specification 3, that Salsbury told Frankel the source of the American Brands rumor, satisfied the two-witness rule. David testified that when Frankel saw him in Teicher's office on March 10, 1986, Frankel warned David to be "a little bit more low key." Tr. 410. Frankel admitted warning David and admitted telling Salsbury that it was "not too good an idea" for David to be in Teicher's office. Tr. 4888, 5159. This evidence corroborated Salsbury's testimony and permitted the clear inference that Frankel knew where the American Brands information originated.

The evidence showed that on March 10, 1986 Frankel for the first time permitted Salsbury to purchase two American Brands call options in his account in violation of Drexel and New York Stock Exchange rules. In addition, Geffen testified that he saw Salsbury and Frankel talking on March 10, 1986 and that soon after he heard Frankel tell Salsbury to do research on American Brands. Geffen also testified to actions by Frankel indicating guilty knowledge: Frankel asked Geffen to retrieve Salsbury's check from the cashier at Drexel, Frankel destroyed a margin slip with the check and Frankel instructed Geffen to destroy an incriminating page from Frankel's desk calendar. Tr. 4282–84, 4313. All of this evidence corroborated Salsbury and led to the clear inference that Frankel lied when he told the S.E.C. that Salsbury had just passed on a "rumor."

The government's case also provided ample corroborating evidence to prove that Frankel lied to the S.E.C. about Salsbury's research on American Brands, the subject of Specifications 1, 2 and 4. Frankel testified that he had had Salsbury do research in February 1986 and that Frankel had not asked Salsbury to do research on March 10, 1986. Specifications 1, 2 and 4. Salsbury testified that he had not done research in February and that Frankel first asked him to do research after the purchase of American Brands call options on March 10, 1986. Tr. 2318–2320.

In addition to the corroborative evidence on Specification 3 above, which also goes to corroborate Salsbury on the issue of the timing of research into American Brands,

Frankel's own tortured attempts to explain the date of the research corroborates Salsbury's testimony that he did no research on American Brands before March 10, 1986.

On June 3, 1986 Frankel initially told the S.E.C. that "the Salsbury analysis was before March 10" and that Salsbury "had already done the financial analysis on my request a while before [March 10]." The S.E.C. then confronted Frankel with a memorandum he had written to Drexel's in house counsel Paul Merolla on April 29, 1986. That memorandum stated that "on March 10, 1986, I told Bob that I was considering buying some American Brands calls and asked him to do a brief financial analysis of the underlying common stock." The memorandum mentioned nothing about research being done before March 10, 1986. Tr. 5036-38. When Frankel saw this memorandum at the S.E.C. he stated that it was wrong and said "I don't know why I wrote that."

On June 5, 1986 Frankel gave another version to the S.E.C. and also relied on this version at the trial before this Court. In this version Frankel stated that he had asked Salsbury to do an analysis in February and had only asked him to do an "update" on March 10 to compare American Brand to other tobacco stocks. Tr. 4973, 5048. But the research in Salsbury's notebook on the back of a page dated March 12, 1986 is an analysis of the break-up value of American Brands using 1984 numbers. It makes no mention of any other tobacco companies. Tr. 5048. The jury was entitled to consider Frankel's story, *United States v. Bagaric*, 706 F.2d 42, 66 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983), and its implausibility corroborates Salsbury's testimony.

As there was ample evidence presented at trial to satisfy the "two witness" rule, Frankel's motion to vacate the perjury conviction is denied.

## ORDER

Defendants' motion are denied in their entirety. Sentencing of the Teicher defendants will be on April 27, 1992 at 4:30 p.m. and sentencing of Frankel will be on April 28, 1992 at 4:30 p.m. in Room 307 of the United States Courthouse.